**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GAS TECHNOLOGY INSTITUTE,** | ) | |
| **GAS RESEARCH INSTITUTE, and** | ) | |
| **ENDESCO CLEAN HARBORS, LLC.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 05 C 2712** |
| | ) | |
| **AMIRALI G. REHMAT, ANTHONY L. LEE,** | ) | **Judge Rebecca R. Pallmeyer** |
| **S. PETER BARONE, *et al.,*** | ) | |
| | ) | |
| **Defendants.** | ) | |

### AMENDED MEMORANDUM OPINION AND ORDER

Over a period beginning as early as 1993 and lasting at least ten years, Plaintiffs, Gas

Technology Institute ("GTI"), Gas Research Institute, ("GRI"), and Endesco Clean Harbors LLC,

("ECH"), entered into subcontracts related to the research and development of certain technologies.

Plaintiffs received project reports and paid invoices for work done under these subcontracts, only

to discover in mid-2002 that the subcontracting entities had not, in fact, performed the work.  In this

lawsuit, filed on May 6, 2005, Plaintiffs, GTI and GRI, Illinois not-for-profit corporations, and ECH,

a for-profit Delaware company, allege that Defendants engaged in a scheme to prepare and submit

fraudulent invoices and charges to Plaintiffs for projects that were never performed.  (Compl. ¶¶ 1,

4.)  In response to the fraudulent invoices, Plaintiffs mailed numerous checks for deposit in bank

accounts set up by Defendants in the U.S. and Canada, and lost millions of dollars as a result of

fraud and deceit by the individual Defendants and the subcontractors they set up to facilitate the

alleged theft and embezzlement.[1]  (*Id.* ¶ 1-3.)  Plaintiffs now seek monetary and punitive damages

---

[1]     Plaintiffs have divided these Defendant subcontractors and the individual Defendants
into three groups based on location.  The Pacific Northwest Group consists of individual Defendants
Minazali Rehmat ("Minaz Rehmat"), Zulfikar Rehmat ("Zuli Rehmat"), Jinnet Hemani (a.k.a. Jinnet
Rehmat), Rozy Fazal, Michael Morin, and subcontractor Defendants Energy and Environmental
Monitors ("EEM"), TEFES Pure Tech, Inc. ("TEFES"), ANE Research Corporation ("ANE"), Benvisa
Technology, Inc., and Ultra-Time Products, Inc.  (Compl. ¶¶ 22-31.)  The Illinois Group is composed
(continued...)

as well as a permanent injunction to prevent Defendants from concealing or squandering these allegedly stolen funds and assets.  (*Id.* ¶ 2.)

In their seven-count complaint,[2] Plaintiffs allege substantive racketeering under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1964 against Defendants S. Peter Barone ("Peter Barone"), Amirali G. Rehmat ("Amir Rehmat"), and Anthony L. Lee ("Tony Lee") (Count I); a racketeering conspiracy under 18 U.S.C. §§ 1962(d) and 1964 against all Defendants (Count II); breach of fiduciary duties and the duty of loyalty against Defendants Peter Barone, Amir Rehmat, Tony Lee, and Serge Randhava (Count III); and common law fraud against Defendants Amir Rehmat, Minaz Rehmat, Peter Barone, Tony Lee, Michael Morin, Lois A. Barone, Charles Wayne Jones, Kathreen L. Jones, Jinnet Hemani, Zuli Rehmat, and Rozy Fazal (Count IV).  In addition, Plaintiff GRI alleges common law fraud against Defendants Shyam Singh, Peter Barone, Serge Randhava, and Richard Kao (Count V), all Plaintiffs allege civil conspiracy to commit fraud against all Defendants (Count VI), and GRI seeks an equitable accounting against Serge Randhava and UT/GT LLC (Count VII).

As described in more detail below, twenty-two of the Defendants now move for dismissal of the various claims against them.[3]  Some of these Defendants move, in the alternative, for

---

[1](...continued)
of individual Defendants Shyam Singh, Surijit Randhava ("Serge Randhava"), Richard Kao, and Defendant subcontractors Resource Recovery Consultants, Inc., Reaction Kinetics Consultants, Inc., Barone Consulting Group, Inc., Unitel Technologies, Inc., and UT/GT, LLC.  (*Id.* ¶¶ 32-39.) The Oklahoma Group consists of individual Defendants Lloyd L. Lee, Charles Wayne Jones, Kathreen L. Jones, and Defendant subcontractors Molecular Thermoengines and Homatex, Inc. (*Id.* ¶¶ 40-46.)

[2]     The court presumes that the Complaint's designation of two counts as "Count VI" was in error.  The court will refer to the civil conspiracy claim as Count VI and to the claim for equitable accounting as Count VII.

[3]     The following Defendants have not moved to dismiss:  Michael Morin, Rozy Fazal, Benvisa Technology, Inc., Energy & Environmental Monitors, Inc., Molecular Thermoengines, Inc., and Ultra-Time Products.  This court previously entered default judgment against Defendant
(continued...)

summary judgment. As explained below, the court declines to consider any materials outside the pleadings and therefore denies the motions for summary judgment without prejudice. Further, the court grants in part and denies in part Defendants Peter Barone and Barone Consulting Group, Inc.'s Motion to Dismiss, grants in part and denies in part Defendants Charles Wayne Jones, Kathreen L. Jones, Homatex, Inc. and Wayne and Associates' Motion to Dismiss the Complaint, grants in part and denies in part Defendants Amirali G. Rehmat, Anar Rehmat, Zulfikar Rehmat, Jinnet Rehmat, ANE Research Inc., and Resource Recovery Consultants, Inc.'s Motion to Dismiss the Complaint, grants Defendants Surijit Randhava, Richard Kao, Unitel Technologies, and UT/GT's Motion to Dismiss, grants in part and denies in part Defendants Susan Lee and Reaction Kinetics Consultants' Motion to Dismiss, grants in part and denies in part Defendant Lloyd L. Lee's Motion to Dismiss, grants in part and denies in part Defendant Anthony Lee's Motion to Dismiss, grants in part and denies in part Defendant Lois Barone's Motion to Dismiss, and grants Defendant Shyam Singh's Motion to Dismiss.

## BACKGROUND

The court accepts all well-pleaded allegations as true on a motion to dismiss. *Shawnee Trail Conservancy v. U.S. Dep't of Agric.*, 222 F.3d 383, 385 (7th Cir. 2000). Plaintiffs GTI and GRI, two of the nation's premier natural gas research and development organizations, provide research products and technical services to help their customers solve environmental and energy problems related to natural gas. (Compl. ¶ 7.) GTI was created in April of 2000 as a "combination" of GRI and the Institute of Gas Technology ("IGT"). (*Id.* ¶ 7.)[4] Endesco Services, Inc. ("ESI"), is a wholly-owned subsidiary of GTI and is also organized under the laws of Illinois. (*Id.* ¶ 8.) In 1997, Plaintiff ECH was established as a jointly-owned, for-profit subsidiary of GRI and ESI with the principal

---

[3](...continued)
Minazali Rehmat. (*See* 6/22/06 Order.)

[4]     The Complaint does not specify the nature of this combination.

mission of constructing and operating commercial-scale plants for waste processing based on the "Cement-Lock Technology," a process that decontaminates soils, sediments, and waste and converts them into a construction-grade cement additive. (*Id.* ¶¶ 9, 11.) At some point subsequent to ECH's formation, Cement-Lock Group LLC licensed the Cement-Lock Technology to Plaintiff ECH. (*Id.* ¶ 54.)

Cement-Lock Group's ownership of rights to the Cement-Lock Technology has a complicated history in itself. Around 1996, Defendants Amir Rehmat and Tony Lee, GTI employees; Richard Kao, a former GTI employee; Serge Randhava, and others began circumventing GTI's policy that GTI employees must assign all of their rights in inventions to GTI. (*Id.* ¶¶ 47-48.) Instead, GTI employees Amir Rehmat and Tony Lee assigned their rights in any GTI technology inventions to Cement-Lock LLC, an entity that Amir Rehmat and Tony Lee formed around 1996 together with Serge Randhava, Richard Kao, Wayne and Associates,[5] Jinnet Hemani, and others for the alleged purpose of misappropriating intellectual property belonging to GTI. (*Id.* ¶¶ 48-49.) In December of 1996, senior GTI staff became aware that GTI employees were attempting to obtain, for Cement-Lock LLC, patents in technology—including the Cement-Lock Technology—largely developed in the course of Amir Rehmat and Tony Lee's employment for GTI, and had filed patent applications in the United States and abroad. (*Id.* ¶¶ 50-51.) GTI responded by negotiating with Cement-Lock LLC for the formation of a new entity, "Cement-Lock Group LLC." (*Id.* ¶ 52.) The formation of Cement-Lock Group LLC in 1997 resolved the dispute between Cement-Lock LLC and GTI concerning the patent rights and gave Cement-Lock Group LLC the

_____

[5]      Plaintiffs allege that Wayne and Associates, a corporation that does not conduct and is not qualified to conduct any business relating to the Plaintiffs' research and development projects, was originally incorporated in Oklahoma in 1992 and underwent a name change in 1994. (Compl. ¶ 46.)

right to hold the intellectual property rights at issue and market and develop the technology. (*Id.* ¶¶ 51-52.)

The Cement-Lock Technology is among the technologies Defendants exploited and misused to perpetrate the fraudulent schemes that give rise to this action. (*Id.* ¶ 10.) This action also concerns the Defendants' misuse of other technologies, including the "ACIMET Technology," the "Perpetual Light Project," the "Gas Tech Technology," the "New Acid Removal System," the "TDP Technology," and the "Thermogenics Technology/Autofluff." (*Id.* ¶¶ 11-17.)

Three of the Defendants—Amir Rehmat, Tony Lee, and Peter Barone (referred to by Plaintiffs as the "Core Group")—had oversight and planning responsibilities for the schemes to defraud Plaintiffs and held positions in each of the Plaintiff organizations. (*Id.* ¶¶ 3, 21.) Amir Rehmat was formerly the president of ECH and an employee of GTI, Tony Lee was a chemical engineer employed by GTI and president of the Cement-Lock Group, and Peter Barone was also the president of ECH at relevant times and employed by GTI and GRI. (*Id.* ¶¶ 18-20.) In each scheme described in the Complaint, a Defendant or Defendants requested that a Plaintiff disburse funds to pay for research, development, or other expenses related to one of the technologies; Defendants in fact intended to distribute the funds among themselves and use them for their own purposes. (*Id.* ¶53.) The Core Group Defendants used their positions as insiders in the Plaintiffs' organizations to facilitate approval of these funding requests. (*Id.*) The Core Group Defendants and other Defendants further set up sham subcontractors and presented fraudulent paperwork to make it appear that the subcontractors would perform the services described. (*Id.*) In combination with other Defendants, the Core Group planned and executed at least the following four schemes to defraud Plaintiffs. (*Id.*) Plaintiffs did not discover the schemes until sometime in mid-2002. (*Id.* ¶ 175.)

1.	**Cement-Lock Technology Scheme**

Plaintiffs claim to have been defrauded of more than $4,300,000 as a result of fraudulent subcontracts relating to the research, development, and testing of the Cement-Lock Technology. (*Id.* ¶¶ 86, Ex.C.) As president of ECH, Defendant Amir Rehmat had the authority to negotiate and execute subcontracts to assist ECH in developing the Cement-Lock Technology licensed to ECH by Cement-Lock Group LLC, as described above. (*Id.* ¶¶ 54-55.) Defendants Tony Lee and Peter Barone were authorized to assist Amir Rehmat in the project to demonstrate the capability of the Technology. (*Id.* ¶ 56.) Together, the Core Group Defendants purported to rely on outside contractors to perform "nearly all of the key and sensitive work needed to develop" the Cement-Lock Technology, (*id.* ¶ 57), with Amir Rehmat preparing and executing subcontracts on behalf of Plaintiff ECH for actual and purported projects related to the Cement-Lock Technology. (*Id.* ¶ 58.) Some of the entities with which Amir Rehmat executed subcontracts were authentic and did work related to the Cement-Lock Technology, but at least ten of the entities, all named as Defendants in this lawsuit, were "sham entities" controlled or owned by the Core Group Defendants, their friends and relatives, or other Defendants, a fact the Core Group Defendants intentionally concealed from Plaintiffs. (*Id.*) Defendants represented to Plaintiffs that the Defendant entities were authentic operations capable of performing work for GTI, GRI, or related to the Cement-Lock Technology, that the subcontracts executed with Defendant entities were valid, and that invoices accurately reflected services rendered. (*Id.* ¶ 81.) These representations caused GTI, GRI, and ECH to pay money to Defendants for work they did not perform. (*E.g., id.* ¶¶ 196, 198, 202, Exs. A & B.)[6]

---

[6]	The Complaint claims, in more than one instance, that GTI and GRI paid money under multiple subcontracts executed between ECH and a Defendant entity. (*See e.g., id.* ¶¶ 190, 192, 194, 196, 198.) As further discussed below, however, the exhibits to the Complaint—spreadsheets listing checks paid to the alleged sham subcontractors—identify payments related to the "Cement Lock Fraud" from GTI only (*see id.* ¶ Ex. C), and list no payments
(continued...)

For example, the Core Group Defendants and individuals from the Oklahoma and Pacific Northwest groups, including Minaz Rehmat, Rozy Fazal, Lloyd Lee, Lois Barone, Zuli Rehmat, Jinnet Hemani, Charles Wayne Jones, Kathreen Jones, and Michael Morin knew that the sham entities were not performing work under the subcontracts and were not qualified to do so. (*Id.* ¶64.) These Defendants nevertheless prepared (or caused to be prepared) contracts between ECH and sham subcontractors TEFES, ANE, EEM, Wayne and Associates, Homatex, and Molecular Thermoengines, and submitted invoices for payment under these subcontracts. (*Id.*) GTI allegedly wrote checks—delivered by mail or other means—on ECH's behalf to pay these sham subcontractors a total of $4,646,442 for purported research and development related to the Cement-Lock Technology. (*Id.* ¶¶64, Ex. A.) Similarly, the Core Group Defendants and individuals from the Oklahoma and Pacific Northwest groups, including Zuli Rehmat, Minaz Rehmat, Jinnet Hemani, Lloyd Lee, Susan Lee, Lois Barone, Charles Wayne Jones, and Kathreen Jones, knew that the entities were not performing such work but nevertheless prepared (or caused to be prepared) and submitted invoices to Plaintiffs for work arising from research and development for GTI or the Cement-Lock Technology Project. (*Id.* ¶¶ 65, Ex. B.) As a result, GTI paid invoices totaling $2,419,580, through checks delivered by mail or other means, for purported research and development related to the GTI or Cement-Lock Technology Project. (*Id.* ¶¶ 65, Exs. A & B.)

Defendant TEFES, a corporation registered under the law of British Columbia, Canada in March of 2002, is among the "sham entities" that subcontracted to do research for ECH. (*Id.* ¶¶27, 59.) TEFES did no actual work on ECH projects, was not adequately capitalized or professionally staffed, and had no research facilities, all of which the Core Group and Defendant Michael Morin

---

[6](...continued)
by GRI in any exhibit. Further, the Complaint alleges that GTI and GRI both paid money under subcontracts executed with ECH, but further states in reference to these subcontracts that "GTI and ECH" paid monies to Defendants. (*Id.* ¶ 202.) Finally, Exhibit A asserts that GTI paid and issued checks on behalf of ECH because ECH "did not have its own payment system." (*Id.* ¶ Ex. A.) Again, no payments by GRI are mentioned.

deliberately concealed from Plaintiffs. (*Id.* ¶ 59.) Morin, an attorney, held himself out as president of TEFES, although he is not qualified to perform any work that relates to the business performed by GTI or the Cement-Lock Technology. (*Id.* ¶¶ 25, 27, 59.) Defendants Peter Barone, Tony Lee, Amir Rehmat, Michael Morin, Minaz Rehmat, and Charles Wayne Jones each had ownership and shared interest in TEFES. (*Id.* ¶ 199.)

TEFES also billed Plaintiffs for marketing services purportedly rendered by other Defendant subcontractors. (*Id.* ¶¶ 199-200.)[7] Around February 5, 2001, Tony Lee prepared and submitted an invoice from TEFES for marketing services rendered by Defendant Reaction Kinetics though Reaction Kinetics never rendered any such services. (*Id.* ¶ 199.) On February 6, 2001, Peter Barone similarly prepared and submitted an invoice for marketing services rendered by Defendant Barone Consulting to TEFES, which also were never rendered. (*Id.* ¶ 200.)

The Core Group Defendants further concealed from Plaintiffs that Amir Rehmat and his brother, Defendant Minaz Rehmat, who was not qualified to perform any work for GTI or related to the Cement-Lock Technology, controlled subcontractor Defendant EEM. (*Id.* ¶¶ 22, 60.) They also concealed the facts that EEM had no production or research facilities, did no actual work on ECH projects, was not staffed with professionals or engineers, and listed as a director Defendant Rozy Fazal, an employee and associate of Minaz Rehmat with no relevant professional background or qualifications. (*Id.* ¶¶ 24, 26, 60.) On October 3, 2001, Amir Rehmat, representing ECH, and Minaz Rehmat and Rozy Fazal, who were associated with EEM, signed and executed a subcontract for

---

[7]     The Complaint is not clear as to whether these marketing services related to the Cement-Lock Technology. In fact, the Complaint lists a number of subcontracts without specifically identifying whether these subcontracts related to the Cement-Lock Technology or to some other technology. Thus, the court recognizes that some of the subcontracts discussed within this section on the "Cement-Lock Technology Scheme" may not actually have concerned work directly related to the Cement-Lock Technology.

research between ECH and EEM. (*Id.* ¶ 191.)[8] Though this work was never performed, it was paid for by GTI and GRI with kickbacks going to Defendants. *(Id.* ¶ 192.)

Defendant ANE, a corporation also registered under the laws of British Columbia, Canada in 2000, was controlled by Amir Rehmat's brother, Defendant Zuli Rehmat, and Zuli Rehmat's wife, Defendant Jinnet Hemani. (*Id.* ¶¶ 22, 23, 28-29, 61.) Neither Zuli Rehmat or Jinnet Hemani had any experience or background to qualify them for work on a GTI or Cement-Lock Technology project. (*Id.* ¶¶ 22, 23.) ANE did no work on ECH projects and had no professional staff or research facilities. (*Id.* ¶ 61.) Nevertheless, ECH had contracted with ANE to perform research on May 29, 2001 and July 15, 2001 in subcontracts executed by Amir Rehmat, Zuli Rehmat, and Jinnet Hemani. (*Id.* ¶ 189.) These Defendants received kickbacks from payments made by GTI and GRI under the subcontracts. (*Id.* ¶ 190.)

Defendant Molecular Thermoengines is an Oklahoma corporation formed in 1994 but suspended in 1995. (*Id.* ¶ 43, 63.) Molecular Thermoengines was controlled by Defendant Lloyd Lee, Tony Lee's brother, and also allegedly did not perform any of the work for which it billed Plaintiffs. (*Id.* ¶¶ 40, 63.) Lloyd Lee and Amir Rehmat executed two subcontracts between ECH and Molecular Thermoengines on June 13, 2000 and November 13, 2000. (*Id.* ¶ 195.) Monies paid by GTI and GRI under these subcontracts were kicked back to these Defendants for their personal use. (*Id.* ¶ 196.)

Defendants Wayne and Associates, incorporated in Oklahoma in 1994, and Homatex, incorporated in Oklahoma in 1997, were controlled by Defendants Charles Wayne Jones, the president of both entities, and his wife, Kathreen Jones, the treasurer of Homatex and secretary of Wayne and Associates. Neither Charles nor Kathreen had a business affiliation with GTI or GRI

---

[8] While the allegation does not specify which Defendants signed on behalf of ECH and EEM, Amir Rehmat negotiated contracts for ECH, (*id.* ¶ 55), and Rozy Fazal and Minaz Rehmat were alleged to have been associated with EEM. (*Id.* ¶ 26.)

or a professional background relating to projects conducted by GTI or ECH. (*Id.* ¶¶ 42, 44-46, 62) Homatex is not qualified to conduct business that relates to Plaintiffs' research and development projects, but Defendant Charles Wayne Jones nevertheless entered into two subcontracts (December 27, 2000 and September 27, 2001) with Amir Rehmat for work to be done by Homatex for ECH. (*Id.* ¶¶ 44, 193.) This work was not performed and the money paid by GTI and GRI was kicked back to Defendants. (*Id.* ¶ 194.) Charles Wayne Jones also signed a subcontract with Amir Rehmat for Wayne and Associates to perform research for ECH, despite the fact that Wayne and Associates is not qualified to do any research related to the work of ECH. (*Id.* ¶¶ 46, 197.) This work was not done, and money paid by GTI and GRI was kicked back to Defendants. (*Id.* ¶ 198.)

The Core Group Defendants and their spouses set up a number of entities in order to deposit, conceal, and spend the money paid by Plaintiffs under the subcontracts related to the Cement-Lock Technology. In each case, the Core Group Defendant and his wife had access to and controlled the bank account of the entity. (*Id.* ¶¶ 69-71.) Amir Rehmat and his wife, Anar Rehmat, set up Defendant Resource Recovery Consultants as an Illinois corporation in 1997. (*Id.* ¶¶ 35, 69.) Tony Lee and his wife, Susan Lee, set up Defendant Reaction Kinetics as an Illinois corporation in 1987. (*Id.* ¶¶ 36, 70.) The Lees also prepared invoices for services to be performed by Defendant Ultra-Time for Reaction Kinetics, which services were not actually rendered. (*Id.*) Peter Barone and his wife, Lois Barone, likewise set up Defendant Barone Consulting. (*Id.* ¶ 71.) The Barones also prepared invoices for services from Barone Consulting to Plaintiffs, though Barone Consulting did not render any services of value. (*Id.*)

Around April 17, 2001, multiple Defendants also signed and executed a Declaration of Trust for the purpose of disposing of funds paid by GTI and GRI. (*Id.* ¶ 186.) By signing this declaration, Defendants Amir Rehmat, Michael Morin, Peter Barone, Lois Barone, Charles Wayne Jones, Kathreen Jones, and others confirmed their ownership and proprietary interests in the TEFES Trust. (*Id.*) Defendants did not inform Plaintiffs of the TEFES trust or of Defendants' ownership of shares

in the TEFES trust.  (*Id.*)[9]

The Core Group Defendants and their spouses as well as Zuli Rehmat, Jinnet Hemani, and Minaz Rehmat diverted and used, for their personal benefit, the monies paid by Plaintiff in a number of instances.  (*Id.* ¶ 72.)  In January of 2002, Amir and Minaz Rehmat diverted $230,000 of funds paid by Plaintiff to EEM in Canada for work EEM claimed to have performed and used the funds to pay off a mortgage loan on Amir's personal residence.  (*Id.* ¶ 73.)  In that same month, Amir and Minaz Rehmat also diverted funds paid to Resource Recovery, EEM, and ANE, (*id.* ¶ 74), and, together with Michael Morin, Tony Lee, and Peter Barone, converted $360,000 that had been paid to TEFES for work performed by TEFES for personal purposes.  (*Id.* ¶ 75.)

In May of 2002, Amir Rehmat, Minaz Rehmat, and Michael Morin diverted $245,000 of Plaintiff's money, and converted $82,000 to Amir and Anar Rehmat, $93,000 to Amir Rehmat's son, and $66,000 to a Canadian bank that was a creditor of Amir Rehmat.  (*Id.* ¶ 76.)  EEM, Peter Barone, and Amir and Minaz Rehmat also took part in kicking back $220,000 of Plaintiffs' funds from EEM to the Barone Consulting Group, the sham entity set up by the Barones.  (*Id.* ¶ 77.)  From February through April 2002, Amir and Zuli Rehmat and Jimmet Hemani took part in another scheme whereby $270,000 of funds paid by Plaintiff to EEM were kicked back to Reaction Kinetics, the sham entity set up by Tony and Susan Lee.  (*Id.* ¶ 78.)

In both 2001 and 2002, the Core Group Defendants and their wives received (and used, in part, to pay mortgages on their personal residences) several million dollars that had been stolen from Plaintiffs and deposited in the accounts of the sham entities that the Core Group Defendants or other Defendants controlled.  (*Id.* ¶ 79.)  In total, Plaintiffs claim that of the $21,000,000 allocated to the development, implementation, and testing of the Cement-Lock Technology, Defendants converted approximately $4,300,000 for their personal use, and that GTI and others incurred at

---

[9]    It is unclear from Plaintiffs' Complaint to what subcontracts this trust was related or exactly what funds were disposed of through the TEFES Trust.

least $1,000,000 in other general costs and expenses as a result of Defendants' scheme. (*Id.* ¶¶ 86, Ex. C.)

## 2. ACIMET Technology Scheme

Plaintiffs also claim losses arising out of fraudulent subcontracts with Defendant entities ANE, TEFES, Molecular Thermoengines, and Ultra-Time Production for work concerning the ACIMET Technology and the related Perpetual Light Technology. The ACIMET Technology is a technology developed by GTI and owned by ECH to treat wastewater sludge in order to generate methane gas, which is then used to generate electric power. (*Id.* ¶ 87.) The Perpetual Light Technology is a process related to ACIMET Technology, developed by GTI and ESI to convert wastewater sludge into electrical power. (*Id.* ¶ 88.) From February 2001 until at least March of 2002, Amir Rehmat, Peter Barone, Michael Morin, Jinnet Hemani, and Lloyd Lee participated in a scheme to defraud Plaintiff GTI of at least $1,051,500 in funds designated for the process referred to as ACIMET Technology. (*Id.* ¶ 89, Ex. D.)

In February of 2001, Amir Rehmat, signing on behalf of ECH, and Jinnet Hemani, signing as President of ANE, executed a subcontract for ANE to conduct research related to an ACIMET facility for $432,900. (*Id.* ¶¶ 91-92, Ex. D.) The subcontract stated, falsely, according to Plaintiffs, that ANE was, among other qualifications, familiar with wastewater treatment technologies and had expertise in "biosolids." (*Id.* ¶ 95.) Neither Jinnet Hemani nor ANE performed any research work under the subcontract, but after causing GTI to pay the $432,000 contract amount, Amir Rehmat, Jinnet Hemani, and other Defendants converted the funds for their personal use**.** (*Id.* ¶¶ 94, 96.)

Defendant TEFES likewise entered into a subcontract with ECH for research relating to the ACIMET and Perpetual Light Technologies in the city of Victoria, British Columbia, Canada. (*Id.* ¶ 98.) Defendants executed this subcontract in July of 2001, Amir Rehmat signing on behalf of ECH and Defendant Michael Morin signing as "Director" of TEFES. (*Id.*) Both Amir Rehmat and Michael Morin knew that TEFES was not capable and would not perform the research for which it

contracted.  (*Id.* ¶¶ 99, 187.)  Amir Rehmat, Michael Morin, and other Defendants nevertheless falsely stated in a "sole source justification form" provided to GRI that TEFES was an expert in waste technologies and had relationships that would help it to secure lucrative projects. (*Id.* ¶101.) The subcontract work was not performed, yet GTI paid $229,600 under the subcontract signed by ECH, its subsidiary**.** (*Id.* ¶¶102-03, Ex. D.)  Amir Rehmat, Michael Morin, Minaz Rehmat, and other Defendants converted this sum to their personal use.  (*Id.* ¶104.)

In June 2001, Amir Rehmat executed, on behalf of ECH, another subcontract with Molecular Thermoengines, this time for "design and engineering work" for the Perpetual Light Technology. Defendant Lloyd Lee signed the contract on behalf of Molecular Thermoengines.  (*Id.* ¶106.)  Amir Rehmat and Lloyd and Tony Lee knew that Molecular Thermoengines would not perform the work for which ECH contracted, and Molecular Thermoengines did not in fact perform such work.  (*Id.* ¶107.)  Nevertheless, Molecular Thermoengines, Lloyd Lee, and Amir Rehmat, submitted a report to Plaintiffs purporting to summarize work on the project.  (*Id.* ¶ 110.)  Between July 2001 and November 2, 2001, GTI sent checks to Molecular Thermoengines for the contracted amount of $365,000, which Amir Rehmat, Lloyd Lee, and other Defendants diverted and used for their personal benefit.  (*Id.* ¶¶ 109, Ex. D.)

Also in June of 2001, Amir Rehmat, Minaz Rehmat, and Rozy Fazal prepared a letter from Defendant Ultra-Time Productions to ECH, proposing to assist ECH in publicizing the Perpetual Light Technology in Canada for a flat fee of $19,700 to Ultra-Time and Fazal.  (*Id.* ¶111.)  In July and August 2001, Amir Rehmat prepared and submitted to ECH a false invoice for services allegedly performed by Ultra-Time, including the publishing of a newspaper article about Perpetual Light Technology—services that Ultra-Time did not in fact provide.  (*Id.* ¶ 112.)  These three Defendants and other Defendants also submitted a purchase order to ECH in July of 2001 in the amount of $4,300 for preparation of a PowerPoint presentation, though no such presentation was ever prepared.  (*Id.* ¶¶113-14.)  GTI paid Ultra-Time a total of $24,000 for work not performed.  (*Id.*

¶ Ex. D.)

3.      **Gas Tech Technology Scheme**

In September 1999, GRI and Defendant Unitel Technologies agreed to form a joint venture to develop and market an "adsorption technology" involving methane gas to be applied in the fertilizer and ammonia markets (the "Gas Tech Project"). (*Id.* ¶ 122.) Gas Tech LLC, formed in early November of 1999, was the result. (*Id.*)  At GRI, Peter Barone was the project manager for the Gas Tech Project; he maintained this responsibility in 1999 and 2000 after the creation of Gas Tech LLC. (*Id.* ¶¶ 122, 127.)  Plaintiffs allege that GRI owned 50% of Gas Tech LLC.[10] (*Id.* ¶ 123.) The other 50% was owned by Defendant UT/GT LLC, a company set up and controlled by Defendant Serge Randhava, who also owned and controlled Unitel Technologies and executed the Gas Tech LLC Agreement on behalf of UT/GT LLC. (*Id.* ¶¶ 118, 123, 129.)  According to Plaintiffs, GRI agreed to provide $650,000 to capitalize Gas Tech LLC in exchange for the intellectual property that UT/GT LLC was to contribute to Gas Tech LLC. (*Id.* ¶ 124.)

Although the agreement required separate capital accounts to be maintained for each member of Gas Tech LLC, Serge Randhava failed to establish or maintain such separate accounts, and funds for Gas Tech LLC were deposited into Unitel Technologies' accounts. (*Id.* ¶¶ 130-31.) Under the Agreement, Randhava was also required to maintain full and accurate books and records of Gas Tech LLC, subject to inspection by each LLC member. (*Id.* ¶ 214.)  Before the filing of the Complaint, Plaintiff GRI requested repeatedly that UT/GT or Randhava, the manager of UT/GT, provide Plaintiff with the accounting information related to the disposition and expenditure of funds by GRI for the Gas Tech Project, but UT/GT and Randhava refused to provide such information.

---

[10]      The court notes that the Gas Tech LLC Agreement shows on its face that GRI International, not Plaintiff GTI, formed Gas Tech LLC together with UT/GT LLC. (*See infra* Section I.A.1; 11/03/99 Limited Liability Company Agreement of Gas Tech, L.L.C., Ex. A to Unitel Motion to Dismiss) (hereinafter "Gas Tech Agreement").  As discussed in the court's analysis of Plaintiffs' standing, there is no mention of GRI International in the Complaint.  The court nevertheless recites here the allegations regarding the Gas Tech Project as set forth in Plaintiff's Complaint.

(*Id.* ¶ 213.)

On about November 15, 1999, Barone requested that GRI pay Gas Tech LLC—through a bank account of Unitel Technologies—the lump-sum of $650,000 for the Gas Tech Project. (*Id.* ¶ 132.) Four days later, on November 19, 1999, Barone caused GRI to transfer the $650,000 to Unitel Technologies' checking account. (*Id.* ¶133.) Defendants Shyam Singh, Serge Randhava, Peter Barone, Richard Kao, Charles Wayne Jones, and others did not work on the research or development for the Gas Tech Project but converted money from Unitel Technologies' checking account for their personal use . (*Id.* ¶¶134, Ex. E.) Defendants "omitted to disclose" to GRI these payments to subcontractors that did no work on the Gas Tech Project, nor did they disclose that at least $530,000 of the funds that GRI had contributed to Gas Tech LLC were not spent on the Project. (*Id.* ¶148.)[11] In total, at least $530,000 of the $650,000 contributed by GRI to Gas Tech LLC for the development, testing, and commercialization of the Gas Tech Technology was converted to the personal use of Defendants specified above and others. (*Id.* ¶¶128, 151.)

The amount converted out of the $650,000 deposited by GRI for the Gas Tech Project varied by Defendant but included the following: Serge Randhava (at least $110,000); Richard Kao (at least $29,000); and Shyam Singh (at least $280,000). (*Id.* ¶¶135-37.) For his part, Randhava used the $150,000[12] he diverted for expenses such as his salary, credit card bills, utility bills, health insurance, and other lease payments relating to his office. (*Id.* ¶¶143, Ex. E.) Randhava further caused $20,000 of the funds to be paid to Wayne and Associates, which were later converted to the personal use of Charles Wayne Jones. (*Id.* ¶ 138.) Barone and Randhava represented to unidentified persons at GRI and others that Wayne and Associates and Charles Wayne Jones were

---

[11]     Plaintiffs do not identify the individuals at GRI from whom information was being concealed or omitted or the individuals at GRI to whom Defendants made misrepresentations.

[12]     Plaintiffs' Complaint alleges that Randhava diverted "at least $110,000 of GRI funds related to the Gas Tech Project," (*id.* ¶135), and later alleges that he diverted at least $150,000 of these same funds. (*Id.* ¶143.)

working on the Gas Tech Project and were entitled to the $20,000.  (*Id.* ¶ 147.)

Around March 25, 2000 and April 25, 2000, Shyam Singh caused two checks totaling $185,425 to be paid to Barone & Associates, an entity controlled by Peter Barone, as a kickback for the GRI funds previously deposited in bank accounts controlled by Singh.  (*Id.* ¶ 139.)  Singh represented to GRI and others that three entities owned or controlled by Singh, including SS Environmental Energy, Inc. and Thermoplastec Inc., would conduct work on the Gas Tech Project and were entitled to be paid more than $300,000.  (*Id.* ¶ 147.)  SS Environmental Energy specializes in processes related to the industries of glass, high temperature firing, petroleum products, textile and food, and Thermoplastec engages in thermoforming tooling and assisting other companies in producing tools and dies.  (*Id.* ¶ 145.)  Thus, Plaintiffs allege, neither of these companies conduct research or development related to the work on methane adsorption conducted by Gas Tech LLC.  (*Id.* ¶ 145.)

To further the scheme relating to the Gas Tech Technology, Randhava, Unitel Technologies, and others prepared a written report on May 30, 2002 entitled "Methane Adsorption in Mixed Gas Streams (A+ Process)."  (*Id.* ¶ 142.)  Randhava and others claimed to GRI and others that the report reflected the work done for $650,000 on the Gas Tech Project. (*Id.*)  The report, however, was incomplete and allegedly did not accomplish the goals of the Gas Tech Project.  (*Id.*)

## 4.    Schemes Related to Other Technologies

Plaintiffs also claim losses to GTI of some $1,652,000 as a result of payments made by GTI for work and services relating to various other technologies—the New Acid Removal System, Thermoengines Technology/Autofluff, and the TDP Technology—that were never performed.  (*Id.* ¶¶ 153-56, Ex. F.)  As with the schemes previously described, Defendants facilitated this scheme whereby GTI paid for work never performed by concealing the relationships between the Core Group Defendants and the subcontractors and by representing to Plaintiffs that the Defendant entities were authentic operations capable of performing the work related to the technology in the

16

subcontract, that the subcontracts executed with Defendant entities were valid, and that invoices accurately reflected services rendered. (*Id.* ¶¶ 81-82.)

The claimed $1,652,000 loss includes $409,000 that the Core Group Defendants, Lloyd Lee, and other Defendants caused GTI to pay to Molecular Thermoengines between May 1996 and February 2000 for work on the New Acid Removal System that was never performed. (*Id.* ¶ 158, Ex. F.) From May 1995 until approximately December 1997, the Core Group Defendants and Lloyd Lee, Charles Wayne Jones, and others also caused GTI to pay $489,000 to Defendants Wayne and Associates and Molecular Thermoengines for work on the Thermogenics Technology/Autofluff project that was not performed. (*Id.* ¶ 159, Ex. F.) Similarly, the Core Group Defendants, Minaz Rehmat, Jinnet Hemani, Lloyd Lee, Rozy Fazal, and others also caused GTI to pay $616,000 to Defendants EEM, ANE, and Molecular Thermoengines between March 2002 and November 2002 for work and services related to the TDP Technology that were never performed. (*Id.* ¶ 160, Ex. F.) Defendants converted the $1,652,000 spent by GTI for work relating to the New Acid Removal System, Thermogenics Technology/Autofluff, and TDP Technology for their personal use and gain. (*Id.* ¶ 163.)

### 6.    Present Action

Plaintiffs filed this Complaint on May 6, 2005.  Count I alleges substantive racketeering by Amir Rehmat, Peter Barone, and Tony Lee under 18 U.S.C. §§ 1962(c) and 1964.  Plaintiffs allege a pattern of racketeering activity conducted through an "enterprise" comprised of these three individual Defendants that also had the legitimate purpose of developing, marketing, and testing various technologies.  (*Id.* ¶¶ 165, 169.)  The alleged ongoing pattern of racketeering activity included acts of mail fraud, and the transportation, possession, and receipt of stolen goods through interstate and foreign commerce.  It allegedly began around 1993 and continued until at least early 2005.  (*Id* .¶¶ 165, 167-68.)  Count II alleges, under 18 U.S.C. §§ 1962(d) and 1964, that all Defendants have conspired to conduct or participate in the affairs of the enterprise with the objective of participating in a pattern of racketeering activity to defraud Plaintiffs of money.  (*Id.* ¶¶ 178-79.)  These acts also give rise to a claim of civil conspiracy to commit fraud against all Defendants in Count VI.  (*Id.* ¶ 210.)  In Count III, Plaintiffs allege that Defendants Amir Rehmat, Tony Lee, Peter Barone, and Serge Randhava each had fiduciary duties arising out of their positions or association with Plaintiffs and breached their fiduciary duties and duty of loyalty by engaging in certain wrongful conduct, including the diverting of Plaintiffs' money and self-dealing.  (*Id.* ¶ 183.)  Count IV alleges common law fraud against Amir Rehmat, Minaz Rehmat, Peter Barone, Tony Lee, Michael Morin, Lois A. Barone, Charles Wayne Jones, Kathreen L. Jones, Jinnet Hemani, Zuli Rehmat, and Rozy Fazal arising out of Defendants' intentional omissions or failures to disclose to Plaintiffs, among other acts, their participation in the TEFES trust, the preparation and submission of invoices for work not performed, and the execution of subcontracts with entities that were not qualified and would not complete the work under the subcontract. (*Id.* ¶¶ 186-204.)  Count V also alleges common law fraud against Shyam Singh, Peter Barone, Serge Randhava, and Richard Kao for omissions and misrepresentations causing GRI to pay these Defendants and Unitel Technologies $530,000 for work not performed.  (*Id.* ¶¶ 206-08.)  Finally, Count VII seeks an

18

equitable accounting from Serge Randhava and UT/GT LLC based on their refusal to provide GRI with accounting information regarding the disposition of funds paid by GRI for the Gas Tech Project. (*Id.* ¶¶ 213-16.)

## DISCUSSION

Federal Rule of Civil Procedure 8(a) requires, in relevant part, that a complaint provide a "short and plain statement of the claim" to give the defendant "fair notice" of the plaintiff's claim and the grounds upon which it rests. FED. R. CIV. P. 8(a); *Cler v. Illinois Educ. Ass'n*, 423 F.3d 726, 729 (7th Cir. 2005) (citations and internal quotations omitted). On a motion to dismiss, the court accepts the complaint's well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor. *Shawnee Trail Conservancy*, 222 F.3d at 385. Dismissal is proper only if no set of facts, even hypothesized, would entitle the plaintiff to relief. *Massey v. Merrill Lynch & Co., Inc.*, 464 F.3d 642, 645 (7th Cir. 2006). Thus, a complaint will survive a 12(b)(6) motion to dismiss as long as it "narrates an intelligible grievance that, if proved, shows a legal entitlement to relief." *U.S. Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 626 (7th Cir. 2003) (citations omitted). If matters outside of the complaint are presented and not excluded by the court in a motion to dismiss under 12(b)(6), however, the court must treat the motion as a motion for summary judgment under Federal Rule of Civil Procedure 56. FED. R. CIV. P. 12(b); *Woods v. City of Chicago*, 234 F.3d 979, 986 (7th Cir. 2000).

This opinion addresses nine motions to dismiss, some of which also seek, in the alternative, summary judgment. Defendants Amirali Rehmat, Anar Rehmat, Zulfikar Rehmat, Jinnet Hemani, ANE Research, Inc., and Resource Recovery (collectively, "the Rehmat Defendants") move to dismiss Plaintiffs' complaint on the ground that Plaintiffs lack standing. They argue, further, that Counts I and II fail to state RICO claims, that Count III for breach of fiduciary duties is barred by the statute of limitations and fails to state a claim, and that Counts IV for common law fraud and Count VI for civil conspiracy to commit fraud fail to state a claim. The Rehmat Defendants also contend

that Count VI is duplicative, and that a release executed on behalf of GTI and its agents with Amir Rehmat exonerates the Rehmat Defendants from all liability.

Defendant Tony Lee joins in the arguments of the Rehmat Defendants and moves to dismiss Counts I, II, III, IV, and VI as against him. Tony Lee further contends that, as an alleged co-conspirator with Amir Rehmat, he, too, is released from liability by Plaintiffs' alleged release of their claims against Amir Rehmat. Defendant Lloyd Lee also joins the Rehmat Defendants' arguments and moves to dismiss Counts II and VI as they apply to him, and seeks enforcement of Plaintiffs' alleged release of Amir Rehmat on his behalf as an agent of Amir Rehmat. Defendants Susan Lee and Reaction Kinetics also adopt the arguments set forth by the Rehmat Defendants and Lois Barone and move to dismiss Counts II and VI for failure to state RICO conspiracy or civil conspiracy claims against them. Susan Lee further argues that she, like Tony and Lloyd Lee, is entitled to dismissal by virtue of the alleged release of co-conspirator Amir Rehmat.

Defendants Peter Barone and Barone Consulting Group, Inc. move to dismiss all Plaintiffs' claims as against them for lack of standing. They further contend that Plaintiffs' RICO claims are time-barred or fail to state a claim, and that Plaintiffs' allegations are insufficient to state claims of breach of fiduciary duties or common law fraud against Peter Barone, or civil conspiracy against both Peter Barone and Barone Consulting. Defendant Lois Barone moves to dismiss Counts II, IV, and VI for failure to state RICO, civil conspiracy, or common law fraud claims against her.

Defendants Charles Wayne Jones, Kathreen Jones, Homatex, Inc. and Wayne and Associates (collectively, "the Jones Defendants") also seek dismissal of Counts II, IV, and VI for lack of standing and failure to state a claim. They urge that Plaintiffs' claim of civil conspiracy to commit fraud must be dismissed as duplicative. Defendant Shyam Singh moves to dismiss Counts II, V, and VI for failure to adequately state RICO, common law fraud, and civil conspiracy claims against Singh. Singh further contends that all claims against him are barred by the statute of limitations.

Finally, Defendants Serge Randhava, Richard Kao, Unitel Technologies, and UT/GT LLC (collectively, the "Unitel Defendants") argue that Plaintiffs lack standing on all claims against the Unitel Defendants including their equitable accounting claim and that all of Plaintiffs' claims are barred by the statute of limitations. The Unitel Defendants further move to dismiss Counts II, III, V, VI, and VII for failure to state claims for RICO conspiracy, common law fraud, civil conspiracy to commit fraud, or equitable accounting against the relevant Unitel Defendants in each count.

The court will addresses the various Defendants' arguments for dismissal in turn.

## I.    Plaintiffs' Standing

### A.    RICO "Standing"

To establish standing to sue, a plaintiff to a civil RICO action must show injury to "his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c); *Evans v. City of Chicago*, 434 F.3d 916, 924-25 (7th Cir. 2006). "[S]ome direct relation between the injury asserted and the injurious conduct alleged" is required. *See Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 267 (1992).[13] A plaintiff who is harmed merely as the result of "misfortunes visited upon a third person" by a defendant's conduct generally cannot establish this direct relation. *See id.* at 268-69. In other words, a defendant's alleged violations of § 1962 must be the proximate cause of the plaintiff's injury. *Id.* at 268.

Whether a plaintiff has "standing" for the purpose of a civil RICO claim is generally viewed as a 12(b)(6) question of whether the plaintiff has stated an actionable claim, and not a question of subject matter jurisdiction. *See Anderson v. Ayling*, 396 F.3d 265, 269 (3d Cir. 2005) (citation omitted); *see also Lemer v. Fleet Bank, N.A.*, 318 F.3d 113, 129-30 (2d Cir. 2003) ("[D]espite describing the proximate causation requirements as 'RICO standing,' such standing is not

---

[13]    The Seventh Circuit has acknowledged that *Holmes* does not preclude all possibility of recovery for indirect injuries; rather, common law ideas about proximate cause inform the proximate cause requirement for RICO purposes. *See Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.,* 61 F.3d 1250, 1257 (7th Cir. 1995).

jurisdictional in nature . . . but is rather an element of the merits addressed under a [12(b)(6)] motion . . . .")  The court will therefore consider Defendants' arguments contesting Plaintiffs' standing to bring their RICO claims under the standards appropriate for a 12(b)(6) motion for failure to state a claim.[14]  Thus, Plaintiffs' RICO claims meet the requirements of § 1964(c) and Plaintiffs can sue under RICO as long as they allege a set of facts that, if true, would entitle them to relief—in this case, an injury to their business or property proximately caused by Defendants' RICO violation. *See Massey,* 464 F.3d at 645.

Defendants' contention that Plaintiffs lack standing to bring their RICO claims, (Counts I and II), rests on the notion that the research grant money allegedly stolen by Defendants was not the property of any of the Plaintiffs.  (Barone Mot. at 3-5; Jones Mot. at 3-10; Rehmat Mot. at 5-12; Unitel Mot. at 6-7.)[15]  Defendants argue that Plaintiffs cannot sufficiently allege that injury to GTI, GRI, or ECH was proximately caused by Defendants' conduct where Plaintiffs did not own the money and thus were not the direct victims of the alleged fraud.  (Barone Mot. at 4; Jones Mot. at 12-13; Rehmat Mot. at 12.)  Rather, Defendants assert, the victims of fraud are representatives of the natural gas industry that paid surcharges to fund research and development of technologies related to natural gas.  Harm to these third parties is not sufficient to confer standing on Plaintiffs, Defendants contend. (Barone Mot. at 4; Jones Mot. at 11-12; Rehmat Mot. at 10-11.)  Defendants

---

[14]     Defendants make extensive arguments contesting Plaintiffs' standing to bring their RICO claims and urge that Plaintiffs lack standing to bring their state law claims for the same reasons.  (*See* Barone Mot. at 4-5; Jones Mot. at 15; Rehmat Mot. at 13; Unitel Mot. at 6-7.)  The court addresses the matter of RICO standing first; Plaintiffs' standing to bring their state law claims, which is a matter of subject matter jurisdiction, is analyzed separately below.  (*See infra* Section I.B.)

[15]     The following Defendants contest Plaintiffs' standing to bring their RICO claims: the Rehmat Defendants, Tony Lee, Lloyd Lee, Susan Lee, Reaction Kinetics, Peter Barone, Barone Consulting Group, the Jones Defendants, and the Unitel Defendants.  Although the court refers to "Defendants" generally for convenience, the court's citations clarify the grounds on which these various Defendants contest Plaintiffs' RICO standing.

also contend that Plaintiffs' claim of damages in the form of general and administrative losses is insufficient because Plaintiffs cannot recover under RICO for such costs.  (Jones Mot. at 13-14; Rehmat Mot. at 12-13.)  The Unitel Defendants more specifically assert that Plaintiffs lack standing because no Plaintiff has an interest in Gas Tech LLC, and therefore Plaintiffs have suffered no injury as a result of the conduct of the Unitel Defendants.  (Unitel Mot. at 6-7.)

In support of their standing challenge, Defendants urge the court to take judicial notice of an order issued by the United States Federal Energy Regulatory Commission (FERC) that, according to Defendants, establishes the following:  GTI and GRI are one entity, GTI; GTI does not operate for profit; and GTI serves only as a conduit for money—money that is not GTI's property—to pay for research intended to benefit others.  (Jones Mot. at 6-8; Rehmat Mot. at 6-7.) Defendants further contend that the court should consider assertions made by GTI in its motion to dismiss in *Cement-Lock v. Gas Technology Institute*, No. 05-C-0018 ("*Cement-Lock* case"), also pending before this court, to the effect that only the agencies granting money for research have standing to sue for the misappropriation of those funds.  (Jones Mot. at 8-11; Rehmat Mot. at 7-10.) GTI also took the position, in its briefs in the *Cement-Lock* case, that GRI was a funding source with standing to sue; as Defendants read it, however, the FERC Order establishes that neither GTI nor GRI has standing: that order confirms that GTI and GRI were one entity and that GRI was not a funding source.  Thus, Defendants assert, GRI could not have been a victim of the alleged fraud. (Jones Mot. at 9-10; Rehmat Mot. at 9.)  They note, further, the Complaint does not allege that ECH is a funding source and conclude that, as the intended beneficiary of the funds at issue, ECH also lacks standing to bring RICO claims.  (Jones Mot. at 10-11; Rehmat Mot. at 9-10.)  The Unitel Defendants also urge the court to consider extraneous material.  They attach to their motion the Limited Liability Agreement of Gas Tech, LLC; because that Agreement shows that none of the named Plaintiffs has an interest in Gas Tech LLC, none can claim injury from any misuse of Gas

Tech LLC funds. (Unitel Mot. at 6-7.)

Plaintiffs insist that GTI, GRI, and ECH each have standing to bring RICO claims because they made direct payments to Defendants, were the direct victims of the fraud, and are best equipped to vindicate the alleged wrongdoing. (*Id.* at 5-6.) Plaintiffs also challenge any consideration of the extraneous evidence Defendants offer. First, they contend it is inappropriate for the court to take judicial notice of findings in the FERC Order, which Plaintiffs claim are disputed. (Pl. Opp'n at 1-3.) In any event, Plaintiffs argue, the FERC order is irrelevant because it concerns funding for a 2005-2009 research and development program, not the funds that GTI, GRI, or ECH used during the relevant time period. (*Id.* at 3-4.) Plaintiffs also argue that the court should not consider Plaintiffs' position in the *Cement-Lock* case—a position that Plaintiffs assert is anyway consistent with Plaintiffs' position here—given that the *Cement-Lock* case has completely different factual allegations. (*Id.* at 7-8.) Likewise, Plaintiffs contend that it is improper for the court to look outside the allegations of the Complaint to determine the standing of the Unitel Defendants. (*Id.* at 6-7.) Those allegations, Plaintiffs argue, show that only GRI injured by Defendants' alleged fraud and racketeering activity as it relates to the Gas Tech Project. (*Id.* at 6-7.)[16]

### 1. Consideration of Extraneous Materials

As a preliminary matter, the court must determine whether it is appropriate to consider the extraneous materials Defendants present—the FERC Order, GTI's statements in the *Cement-Lock* case, and the Gas Tech LLC Agreement—in assessing Plaintiff's standing under RICO. Consideration of extraneous materials usually requires the court to convert Defendants' motion to dismiss into one for summary judgment under Rule 56. FED. R. CIV. P. 12(b); *Woods*, 234 F.3d at 986; *see Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (Rule

---

[16]    Consistent with this contention, the claims of common law fraud and equitable accounting (Count VII) that arise solely out of the Gas Tech Project (Count V) are only brought by Plaintiff GRI.

12(b)'s requirement is mandatory, and that if documents outside the pleadings are put before the court and not excluded, the court "must convert a motion to dismiss to one for summary judgment and afford the plaintiff the opportunity to submit evidentiary materials").  The court can, however, take judicial notice of a public record without converting a motion to dismiss to one for summary judgment.  *Gen. Elec. Cap. Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). "Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim;" thus, the court can consider such documents without converting the motion to one for summary judgment.  *Venture Assocs. Corp.*, 987 F.2d at 431 (citation omitted).  Further, the court is not required to convert a motion to dismiss to a motion for summary judgment if it excludes the extrinsic evidence from consideration.  *See* FED. R. CIV. P. 12(b); *see, e.g.*, *E.E.O.C v. Park Ridge Pub. Library*, 856 F. Supp. 477, 480 (N.D.Ill. 1994).  For the reasons set forth below, the court will not consider the FERC Order and GTI's statements in the *Cement-Lock* case as Defendants urge.  The court will, however, consider the Gas Tech LLC Agreement as a part of the pleadings without converting these motions to dismiss into motions for summary judgment.

First, the FERC Order: Defendants claim that the Order, (11/18/04 FERC Order, Ex. A to Rehmat Mot. to Dismiss), establishes that Plaintiffs GTI and GRI cannot claim injury from Defendants' alleged RICO violation because GRI and GTI are one in the same, and GTI, a mere conduit for money paid by participants in the natural gas industry, could not have been harmed by misuse of that money.  (Jones Mot. at 7-8; Rehmat Mot. at 6-7.)  Plaintiffs and Defendants agree that judicial notice of the FERC Order, a public record, would not require the court to convert Defendants' motion to dismiss to a motion for summary judgment.  (Jones Mot. at 6; Rehmat Mot. at 6-7.)  Nevertheless, the court concludes that the factual findings contained within the FERC Order are not properly a matter for judicial notice, and declines to otherwise consider the disputed facts in the FERC Order at this stage.

Judicial notice is proper when a fact is "not subject to reasonable dispute." FED. R. EVID. 201(b). Courts generally do not take judicial notice of findings of facts from other proceedings for their truth because "these findings are disputable and usually are disputed." *Gen. Elec. Cap. Corp*, 128 F.3d at 1082 n.6. Citing *Texas & Pacific Railway Company v. Pottorff*, 291 U.S. 245, 254 n.4 (1934), Defendants compare the findings set forth in the FERC Order to government reports, treatises, and textbooks, materials that courts have judicially noticed. (Jones Reply at 5-6.) The court is not persuaded by the comparison. Findings of fact in an agency order reached through an adversarial process are wholly different from publications issued by organizations considered authoritative on the topics the publication addresses. Plaintiffs here assert that they did dispute the findings in the FERC Order. (Pl. Opp'n at 3.) Drawing all reasonable inferences in favor of Plaintiffs at this stage, the court presumes that at least some of the disputes concerned findings of which Defendants ask the court to take judicial notice.

It is true that a court may take judicial notice of another court's order—or, as here, an agency's order—for the limited purpose of recognizing that the "judicial act" occurred or the subject matter of the litigation. *See Opoka v. I.N.S.*, 94 F.3d 392, 395 (7th Cir. 1996) (citing *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994)). Though Defendants cite *Opoka*, (Jones Reply at 5), they fail to mention this important limitation. Here, however, the fact that an agency hearing occurred regarding an application by GTI for approval for a 2005-2009 research program and certain funding related to that program is irrelevant to determining whether Plaintiffs have adequately alleged that Defendants' RICO violations proximately caused them injuries. The court therefore declines to take judicial notice of the FERC Order and otherwise excludes the FERC Order from consideration in determining Plaintiffs' RICO standing.

The court likewise excludes from consideration certain statements that appear in GTI's pleadings in the *Cement-Lock* case. (*See* 2/23/05 Memorandum, Ex. C to Rehmat Mot. to Dismiss.) Specifically, Defendants urge the court to consider GTI's statement in the *Cement-Lock*

26

case that only the granting agencies that awarded money used for the research grants were the direct victims of the fraud at issue and had standing to sue for the misappropriation of those funds. (Jones Mot. at 9; Rehmat Mot. at 8.)  Although they have not so characterized their argument, Defendants appear to be arguing that Plaintiff GTI is judicially estopped by its contentions in the *Cement-Lock* case from asserting its standing here.  Judicial estoppel prevents a party who prevails on one legal or factual ground in a lawsuit from later repudiating that ground in subsequent litigation.  *See Urbania v. Central States, Southeast and Southwest Areas Pension Fund*, 421 F.3d 580, 589 (7th Cir. 2005) (citation omitted).  For judicial estoppel to apply, (1) the later position must be clearly inconsistent with the one the party took in prior litigation, (2) the facts at issue in both cases must be the same, and (3) the party taking inconsistent positions must have "prevailed upon the first court to adopt the position."  *See id.* (citing *United States v. Hook*, 195 F.3d 299, 306 (7th Cir. 1999)).

GTI's position in its motion to dismiss the *Cement-Lock* case—that only the granting agencies who owned the funds at issue in the *Cement-Lock* case had standing to sue for the misappropriation of those funds—does not merit the application of the doctrine of judicial estoppel to preclude Plaintiffs from bringing this case.  Defendants admit that the factual allegations in the present case "are very different" from those in the *Cement-Lock* case.  (Rehmat Reply at 3-4.)  The court notes that the Plaintiffs who claim to have been defrauded in this case are not completely identical to the defendants in the *Cement-Lock* case.  More importantly, however, Plaintiffs did not prevail in convincing the court to adopt their position in the *Cement-Lock* case: this court rejected GTI's position and allowed the plaintiffs in the *Cement-Lock* case to pursue RICO claims against entities other than the granting agencies, finding in that case that the plaintiffs' "relationship with the grant funding sources was a direct target of the alleged scheme."  *See Cement-Lock v. Gas Tech. Inst.*, No. 05-C-0018, 2005 WL 2420374, *12 (N.D.Ill. Sept. 30, 2005).  The court further concluded that because the *Cement-Lock* plaintiff was the intended recipient of the funds, it was

"thus a direct victim of the alleged misappropriation of funds." *See id.* Accordingly, GTI's position in the *Cement-Lock* case does not bar it from pursuing this case.

Whether the court should consider the Gas Tech LLC Agreement in determining Plaintiffs' standing to bring a RICO claim against the Unitel Defendants presents a closer issue. The Unitel Defendants urge that the Agreement shows that Plaintiff GRI could not have been injured by the alleged misappropriation of Gas Tech LLC funds: it shows that, contrary to Plaintiffs' allegations, GRI was not a 50% party to the Gas Tech LLC Agreement. (Unitel Mot. at 6-7, citing Compl. ¶¶ 123, 129.) In fact, the Unitel Defendants assert, the Agreement shows that Plaintiffs have "no interest whatsoever" in Gas Tech LLC. (Unitel Mot. at 6-7.) Plaintiffs argue that the court is restricted to the allegations of the Complaint, (Pl. Opp'n at 6), but they do not dispute the authenticity of the Gas Tech LLC Agreement or otherwise address the Unitel Defendants' claim that no Plaintiff was a party to the Gas Tech LLC Agreement. Nor have Plaintiffs alleged a relationship to GRI International, which is a party to the Agreement. (Unitel Mot. at 6 n.4.) The court may consider documents attached to a motion to dismiss if the documents are referred to in the complaint and are central to Plaintiff's claim. *McCready v. Ebay, Inc.*, 453 F.3d 882, 891-92 (7th Cir. 2006) (citations omitted); *Venture Assocs.*, 987 F.2d at 431. Such documents are not considered to be outside the pleadings and may be addressed without converting a motion to dismiss into one for summary judgment. *See McCready*, 453 F.3d at 892; *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994).

In *Wright*, the Seventh Circuit found a "Health Insurance Risk Plan Administration Agreement" between one of the defendants (AICI) and a third-party (ICHIA) central to the plaintiff's claim and held that the district court properly considered that agreement, which was attached by the defendants to their motion to dismiss, when deciding whether to dismiss the plaintiff's complaint. *Id.* at 1247-48. In the agreement, AICI agreed to provide ICHIA with a manager to administer a certain plan, a position subsequently offered to the plaintiff, and in a later amendment to the

agreement, AICI assigned its rights and obligations under the agreement to one of its subsidiaries who was also named as a defendant. *Id.* at 1247. The court found the agreement central to the plaintiff's § 1983 claim, which alleged that the agreement granted him a property interest in his employment. *Id.* at 1248. The court further found the agreement central to the plaintiff's claim of tortious interference with his contractual relationship since the agreement was the contract with which the defendants allegedly interfered. *Id.*

Here, Plaintiffs' Complaint similarly refers several times to the November 3, 1999 Agreement to create Gas Tech LLC, stating that under the Agreement, GRI was a 50% owner of Gas Tech LLC and that GRI agreed to provide $650,000 to capitalize Gas Tech LLC. (*See* Compl. ¶¶ 124, 129-30, 214.) This Agreement is central to Plaintiffs' claims against the Unitel Defendants: Plaintiffs' claim arises out of the Unitel Defendants' misappropriation of $650,000 that Plaintiffs allegedly paid under the Agreement. (*Id.* ¶¶ 122-48.) The court will therefore consider the Gas Tech LLC Agreement in its analysis of Plaintiffs' RICO standing against the Unitel Defendants.

### 2. Analysis of Plaintiffs' RICO "Standing" Under Rule 12(b)(6) Standard

As described above, a plaintiff to a civil RICO action must show injury to "his business or property" proximately caused by a defendant's violation of section 1962. 18 U.S.C. § 1964(c); *Holmes*, 503 U.S. at 267-68; *Evans*, 434 F.3d at 924-25. In other words, the plaintiff must show some "direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268. The court now turns to whether Plaintiffs have adequately alleged that Defendants' violations of § 1962 proximately caused injury to Plaintiffs' businesses or property, *see Anderson*, 396 F.3d at 269, considering only the Complaint, which includes the Gas Tech LLC Agreement.

Defendants argue that Plaintiffs are not the direct victims of the alleged fraud and that Defendants' alleged conduct could not have proximately caused harm to Plaintiffs. According to Defendants, the direct victims are the companies in the natural gas industry that pay a mandatory

surcharge to fund the research that GTI administered or distributed.[17]  Accordingly, the alleged fraudulent scheme could only cause harm to the companies that funded the research grants. (Barone Mot. at 4; Jones Mot. at 12-13; Rehmat Mot. at 10-12.)  Plaintiffs assert that Defendants proximately caused them harm because Plaintiffs made payments directly to Defendants, and Plaintiffs were the intended targets and victims of the alleged fraud.  (Pl. Opp'n at 4-6.)  Although Plaintiffs' cursory response to Defendants' standing challenge seems to imply that each of the three Plaintiffs were affected equally by Defendants' alleged RICO violations, the court finds otherwise.

The facts alleged establish that only Plaintiffs GTI and GRI, and not ECH, have standing to sue Defendants under RICO.  As to both the Unitel Defendants and Shyam Singh, all of whom are named in the claim for racketeering conspiracy (Count II), the allegations do not support that any of the Plaintiffs, including GTI or GRI, have standing to sue the Unitel Defendants or Shyam Singh under RICO.[18]  Plaintiffs cite this court's decision in *State Farm Mutual Auto Insurance Co. v. Abrams*, No. 96-C-6365, 2000 WL 152143 (N.D. Ill. Feb. 4, 2000), for the conclusion that GTI, GRI, and ECH each have standing to sue Defendants if they made payments directly to Defendants, the alleged wrongdoers, and if Plaintiffs were the targets of the alleged fraudulent acts.  (Pl. Opp'n at 5-6.)[19]  In *Abrams*, the plaintiff insurance company sued attorneys and health care providers alleged to have orchestrated automobile accidents, which eventually caused the plaintiff insurer to pay these defendants, the alleged wrongdoers, as the result of property damage and personal injury

---

[17]     Plaintiffs have not explained the source of the obligation to pay the mandatory surcharge.

[18]     Although Shyam Singh has moved to dismiss the RICO claim, he has not specifically argued that Plaintiffs lack standing.  (*See* Singh Mot. at 1-2.)  The court provides further detail below on why the RICO claims against Shyam Singh are nevertheless appropriate for dismissal.

[19]     In *Abrams*, this court certified a question regarding the plaintiff's ability to seek recovery under RICO to the Seventh Circuit.  *See Abrams*, 2000 WL 152143, at *3-4.  The Seventh Circuit declined interlocutory review and this court subsequently affirmed its preliminary conclusion that the plaintiff had sufficiently established its RICO standing.  *See State Farm Mut. Auto. Ins. Co. v. Abrams*, No. 96-C-6365, 2000 WL 574466, *3 (N.D. Ill. May 11, 2000).

claims arising out of the accidents. *Abrams*, 2000 WL 152143, at *1-2. This court found that the *Abrams* plaintiff had RICO standing because the injury to the plaintiff was direct—the plaintiff had made payments directly to the defendants. *Id.* at *2. The court further found that the fraudulent acts the plaintiff alleged were directly related to the conspiracy's goal of defrauding insurance companies. *Id.*

The analysis in *Abrams* illustrates precisely why the allegations here support the conclusion that only GTI and GRI have standing to sue Defendants for their alleged RICO violations. Plaintiffs have alleged that GTI and GRI suffered economic losses to their business as a proximate result of Defendants' RICO violations. (*See, e.g.*, Compl. ¶¶ 174, 180.) *See Evans*, 434 F.3d at 932 (stating the injuries must be "concrete and actual" to confer RICO standing on plaintiff) (citations omitted). Defendants contend that GTI and GRI's injury is an indirect injury and cite *Marshall & Ilsley Trust Company v. Pate*, 819 F.2d 806 (7th Cir. 1987), and *Mid-State Fertilizer Co. v. Exchange National Bank of Chicago*, 877 F.2d 1333 (7th Cir. 1989), to support their argument that a derivative injury, as opposed to a direct injury, "is not sufficient to convey standing under § 1964(c)." (Jones Reply at 9-10.) While Defendants' view of the law is correct, their view of the facts—that the injury here is derivative because the direct victims of Defendants' alleged scheme are the members of the natural gas industry that initially funded the research—is not. (*Id.* at 9-10.)

The Complaint alleges that GTI and GRI exist for the purpose of providing research and technology development for the natural gas industry. (*Id.* ¶ 1.) Regardless of the original source of the funds with which GTI and GRI funded their research and development—a fact that is not apparent from the four corners of the Complaint—they possessed and distributed funds to further research and development work for the natural gas industry. The Complaint, without question, adequately alleges that GTI provided funds to Defendants for such research and development.

(*See e.g., id.* ¶¶ Exs. A-D, F) (listing hundreds of checks written by GTI to Defendants).[20]  GRI, as well, allegedly paid money to a variety of entities—namely, ANE, EEM, Homatex, Molecular Thermoengines, and Wayne and Associates—that were misappropriated and kicked back to various Defendants. (Compl. ¶¶ 190, 192, 194, 196, 198.) Other portions of the Complaint do raise questions as to whether GRI ever directly paid funds to Defendants as is necessary to establish that GRI was victimized by the later misappropriation of these funds.  The exhibits documenting Plaintiffs' injury identify payments by GTI; no payments by GRI are listed in any exhibit.  And, although it alleges that GTI and GRI both paid money under subcontracts executed with ECH, the Complaint further states in reference to these subcontracts that "GTI and ECH" paid monies to Defendants.  (Compl. ¶ 202.)  Exhibit A, which purports to be a list of payments by ECH to fraudulent subcontractors, notes without mentioning GRI that GTI paid and issued checks on behalf of ECH because ECH "did not have its own payment system." (*Id.* ¶ Ex. A.)  Viewing the allegations in the light most favorable to GRI, however, the court acknowledges that the list of checks contained in the exhibits may not be an exhaustive list.  (*See id.* ¶ 165) (implying that Exhibits A-F are only a partial list of checks mailed in response to Defendants' fraud).  The court will accept as true, as it must, Plaintiffs' well-pleaded allegations that not only GTI but GRI as well paid money that was later misappropriated.  (*Id.* ¶¶ 190, 192, 194, 196, 198.)

Accepting, then, the allegation that GTI and GRI both paid funds to Defendants, it is reasonable to infer that GTI and GRI were the intended recipients of the funds they distributed and were therefore the direct victims of Defendants' misappropriation of those funds.  *See Cement-Lock*, 2005 WL 2420374, at *12 ("Cement-Lock was the intended recipient of the funds, and thus a direct victim of the alleged misappropriation of funds.")  As the direct victim of Defendants'

---

[20]        In light of Plaintiffs' allegation that "GTI was created in April 2000," (*id.* ¶7), the court is perplexed as to how GTI was writing checks to subcontractors well before 2000.  (*See id.* ¶¶ Exs. A-D, F.)

misappropriation, the injury to GRI and GTI was not derivative. When a business receives nothing in return for its expenditures, those expenditures constitute a business injury within the meaning of § 1964(c), even for not-for-profit entities. 18 U.S.C. § 1964(c) (allowing recovery under RICO for injuries to "business or property"). Drawing all reasonable inferences in Plaintiffs' favor, the money spent or revenue gained would otherwise have been spent productively to further the research and technology development related to natural gas, the very purpose for which GTI and GRI exist. (Compl.¶ 1.)

The Complaint also alleges in numerous instances that Defendants' RICO violations—the scheme of fraudulent subcontracts, bills, reports, and invoices that comprised Defendants' racketeering activity—were the proximate or direct cause of Plaintiffs' injury. (Compl. ¶¶ 174, 180.) As for GTI, the Complaint contains the following allegations that GTI's injury was proximately caused by Defendants' RICO violations:

- As a direct and proximate result of the misconduct and scheme to defraud perpetrated by defendants Amir Rehmat, Jinnet Hemani, and ANE Research Group, GTI lost $432,900 that it paid for the phony invoices issued by ANE Research Group and approved for payment by defendant Amir Rehmat relating to the ACIMET/Perpetual Light projects. (*Id.* ¶ 97.)

- As a direct and proximate result of the misconduct and scheme to defraud perpetrated by Core Group defendants Amir Rehmat and Pacific Northwest Group defendants Michael Morin, Minaz Rehmat, and TEFES Pure Tech, GTI lost $229,600 that it paid for the phony invoices issued by TEFES Pure Tech and fraudulently approved for payment by defendant Amir Rehmat relating to the ACIMET/Perpetual Light projects. (*Id.* ¶ 105.)

- As a direct and proximate result of the foregoing willful misconduct and scheme to defraud perpetrated by Core Group defendants Amir Rehmat, Peter Barone, and Tony Lee, together with Oklahoma Group defendants Lloyd Lee, Molecular Thermoengines and Pacific Northwest Group defendants Minaz Rehmat, Jinnet Hemani, Michael Morin, ANE Research, and TEFES Pure Tech, GTI lost $1.051,500 that it paid for the phony invoices issued by Molecular Thermoengines, TEFES Pure Tech, ANE Research and others that defendant Amir Rehmat, Peter Barone, and Tony Lee fraudulently approved for payment relating to the ACIMET/Perpetual Light projects. (*Id.* ¶ 117.)

- As a direct result of the foregoing scheme to defraud, interstate transport of stolen GTI funds, and willful misconduct, over $1,652,000 belonging to Plaintiff GTI spent on and allocated to the New Acid Removal System, Thermogenics Technology, and TDP Technology was illegally converted to the personal use and gain of defendants. (*Id.* ¶ 163.)

GTI has therefore alleged a direct relation between Defendants' conduct and GTI's injury. *Holmes*,

503 U.S. at 267-68.

While the Complaint does not set forth comparable allegations pertaining to GRI, viewing the evidence in the light most favorable to Plaintiff, the court concludes that GRI has also adequately pleaded the proximate cause element of RICO standing. As discussed above, GRI has adequately pleaded that it paid money to Defendants that was later misappropriated. This fact, presumed true here, coupled with Plaintiffs' general allegations that Defendants' RICO violations were the proximate or direct cause of Plaintiffs' injury, (Compl. ¶¶ 174, 180), are sufficient for the court to find that GRI has adequately established that Defendants' alleged RICO violations proximately caused GRI a concrete injury.

That leaves the matter of ECH's standing under RICO. The Complaint alleges that "Plaintiffs," generally speaking, were directly and proximately injured by Defendants' conduct because "they paid out more than $7,600,000 in connection with fraudulent bills, reports, and invoices arising from the pattern of racketeering activity." (Compl. ¶¶ 174, 180.) As explained above, the court is willing to infer that this general language applies to GRI as well as to GTI. Plaintiffs ask the court to infer that ECH also made direct payments to the alleged wrongdoers, a fact they acknowledge is necessary for RICO standing. (Pl. Opp'n at 5.) *See Abrams*, 2000 WL 152143, at *2. Notably, however, not one allegation states specifically that ECH paid and lost funds as a result of Defendants' RICO violations. Nor does the Complaint identify any other compensable losses to ECH as a proximate result of Defendants' RICO violations.[21] Of the 246 checks listed as "RICO Events" Exhibits A through F, which Plaintiffs attach as a part of the Complaint to detail their injuries (Compl. ¶ 180), not one was paid by ECH. In fact, in Exhibit A, which purportedly details

---

[21] While the Complaint subsequently alleges, under the captions of the state law claims, that "Plaintiffs," generally speaking, have lost money, customers, revenue, and goodwill, the Complaint does not allege that such losses are a proximate result of Defendants' RICO violations. (*See e.g.*, Compl. ¶ 204.)

payments by ECH as a result of the fraudulent subcontracts alleged to be a part of the RICO scheme, Plaintiffs acknowledge that "GTI issued and paid these checks on behalf of [ECH] because [ECH] did not have its own payment system." (*Id.* ¶ Ex. A.). Even if GTI made payments on ECH's behalf pursuant to subcontracts to which ECH was a party, the court is not satisfied that ECH suffered any direct injury. *See Holmes*, 503 U.S. 258, 267 (requiring "some direct relation between the injury asserted and the injurious conduct alleged"; harm to plaintiff as a result of "misfortunes visited upon a third person" is not sufficient to establish direct relation between RICO violation and injury).

Plaintiffs do claim that "GTI and others" incurred over $1,000,000 "in other general and administrative losses, costs, and expenses." (Compl. ¶ 86.) This allegation is not sufficient in the court's view to rectify ECH's failure to allege that RICO violations by Defendants proximately injured ECH's business or property. If "others" is meant to include ECH, the allegation is insufficient to give notice to Defendants of the nature of ECH's losses. *See Cler*, 423 F.3d at 729 (stating that the complaint must give the defendant "fair notice" of the plaintiff's claim and the grounds upon which it rests). Nor does Plaintiffs' allegation that they "have incurred substantial investigative, audit, legal fees, and litigation expenses in an amount to be determined, but well in excess of $1,500,000," (Compl. ¶¶ 174, 180), alter the court's analysis. First, it is not clear that losses such as the cost of an investigation are always compensable under RICO. *See Rylewicz v. Beaton Servs., Ltd.*, 698 F. Supp. 1391, 1396 (N.D. Ill. 1988) (finding the cost of investigation not compensable under RICO where it was a pecuniary loss incident to injuries that did not give rise to RICO standing). In any case, Defendants could not have caused a direct injury to ECH's business or property as a result of investigative, audit, legal fees, and litigation expenses if ECH itself did not have the capacity to make payments for such fees and expenses. *See Holmes*, 503 U.S. at 267. Again, if the injury to ECH is an indirect one, merely the result of an injury to GTI or another third party who paid the expenses on ECH's behalf, there is no direct relation between the alleged RICO violations and

injury suffered by ECH. *See Holmes*, 503 U.S. at 267-69.

The court also concludes that no Plaintiffs, including GTI or GRI, have standing to sue the Unitel Defendants or Shyam Singh under RICO. The Complaint does allege, in relation to the Gas Tech Project, that GRI lost over $530,000 of the $650,000 it allocated and paid "for the development, testing and commercialization of the Gas Tech Technology." (Compl. ¶ 151.) As stated above, the Gas Tech LLC Agreement—the agreement pursuant to which GRI claims to have paid this $650,000 sum—is referenced in Plaintiffs' Complaint and may fairly be considered as part of the pleadings for the purpose of this motion to dismiss. (*See supra* Section I.A.1.) The Unitel Defendants argue that because neither GRI (nor any other Plaintiff) is a party to the Gas Tech LLC Agreement and Plaintiffs have not alleged a relationship to GRI International or an interest in GRI International, which is a party to the Agreement, Plaintiffs cannot claim to have been injured by the misuse of Gas Tech LLC's funds. (Unitel Mot. at 7.) Plaintiff makes no substantive response to this argument. (Pl. Opp'n at 6-7.) The court agrees with Defendants and further finds that, for the same reasons that all Plaintiffs lack RICO standing to sue the Unitel Defendants, they also lack standing to bring a RICO claim against Shyam Singh.[22]

The Gas Tech LLC Agreement is between UT/GT LLC and GRI International, Inc., who is not a plaintiff to this action. (*See* Gas Tech Agreement at 1.) The Agreement never mentions

---

[22] Shyam Singh stands in the same position as the Unitel Defendants *vis a vis* the Plaintiffs for the purpose of RICO standing, primarily because all allegations against both the Unitel Defendants and Shyam Singh arise out of the Gas Tech Project. Thus, if no Plaintiffs have RICO standing to sue the Unitel Defendants because the allegations do not support that any of the Plaintiffs were injured by the Gas Tech Project, it naturally follows that the allegations also do not support RICO standing against Shyam Singh. Because RICO standing is considered as a matter of whether the plaintiff has stated a claim, the court notes that *sua sponte* dismissals for failure to state a claim are permitted if "a sufficient basis for the court's action is apparent from the pleading." *See Apostol v. Landau*, 957 F.2d 339, 342-43 (7th Cir. 1992) (citations omitted). Not only is the basis for the court's dismissal of the RICO claims against Shyam Singh apparent from the pleadings, which include the Gas Tech Agreement, but the Unitel Defendants' Motion to Dismiss has put the Plaintiffs on notice of the arguments that justify dismissal of the RICO claims against Shyam Singh, and Plaintiffs have had the opportunity to respond to those arguments.

Plaintiff Gas Research Institute, a not-for-profit Illinois company, or either of the other Plaintiffs. (*See id.*; Compl. ¶ 1.)  Exhibit A to the Gas Tech Agreement confirms that the only members of Gas Tech LLC are "GRI International, Inc., a for-profit Delaware corporation" and UT/GT, LLC, (*see id.* at 15).  (*But see* Compl. ¶ 123) ("Gas Tech LLC was 50% owned by GRI and 50% owned by defendant UT/GT LLC . . . ")  Given the plain language of this Agreement and given that the Plaintiffs have alleged no facts to establish a relationship between GRI and GRI International, the court cannot reasonably infer that the Unitel Defendants or Shyam Singh have proximately caused GRI any injury sufficient to enable GRI to sue these Defendants under RICO.

Nor has any other Plaintiff sufficiently alleged its standing to bring a RICO claim against the Unitel Defendants or Shyam Singh.  No other Plaintiff is alleged to have been injured as a result of money paid in connection with the Gas Tech Project.  (Compl. ¶ 151.)  No allegations except those pertaining to the Gas Tech Project name the Unitel Defendants or Shyam Singh, so the court cannot infer their participation in any of the other schemes alleged from the allegations.  Further, aside from checks paid by Gas Tech LLC in connection with the Gas Tech Project, Exhibits A through F detailing the checks paid in connection with Defendants' alleged fraudulent scheme show no involvement of the Unitel Defendants or Shyam Singh in any other scheme.  Thus, as GRI lacks standing to sue the Unitel Defendants and Shyam Singh under RICO, no other Plaintiff stands in such direct relationship as to give rise to a RICO claim against the Unitel Defendants or Shyam Singh.  In their opposition brief, Plaintiffs admit as much when they state that "the only entity which actually paid the money to the alleged wrongdoers for the Gas Tech project, and the only entity that lost its money for the Gas Tech project because of the Defendants' fraud and racketeering activity, is Plaintiff GRI."  (Pl. Opp'n at 7.)

ECH's claims under RICO are dismissed without prejudice as against all Defendants—including those who did not move for dismissal and those who did not raise a standing

challenge. GTI and GRI do have standing to bring their RICO claims, with the exception of the RICO claim against the Unitel Defendants and Shyam Singh. The sole RICO claim against the Unitel Defendants and Shyam Singh is therefore dismissed without prejudice.

## B. Plaintiffs' Standing To Bring State Law Claims

Plaintiffs' standing to bring their state law claims is a matter of subject matter jurisdiction. *See O'Sullivan v. City of Chicago*, 396 F.3d 843, 853 (7th Cir. 2005). The analysis of Article III standing for these claims thus differs from the 12(b)(6) analysis applicable to RICO standing. To have standing, a plaintiff must have a personal stake in the outcome of a dispute that concerns the legal rights of two parties with adverse legal interests so as to ensure a sharp presentation of the legal issues to the court. *See id.* at 854. To this end, a plaintiff seeking to sue in federal court must demonstrate: "(1) an 'injury in fact–an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;' (2) a causal connection between the injury and the conduct complained of, that is, the injury is fairly traceable to the challenged action of the defendant, not the result of 'the independent action of some third party not before the court;' and (3) a favorable decision likely will redress the injury." *See id.* at 854 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Prudential considerations, such as a general prohibition against a litigant raising the legal rights of another person, a bar on adjudicating general grievances better suited to legislative action, and a requirement that a plaintiff's complaint falls "within the zone of interest" that the law invoked protects, also inform standing requirements. *O'Sullivan*, 396 F.3d at 854 (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)).

Defendants contend that the arguments against Plaintiffs' RICO standing apply equally to their contention that Plaintiffs lack standing to bring their state law claims for breach of fiduciary duties, common law fraud, civil conspiracy to commit fraud, and equitable accounting. (*See* Barone

Mot. at 4-5; Jones Mot. at 15; Rehmat Mot. at 13; Unitel Mot. at 6-7.) For the reasons explained earlier, in addressing this issue, the court considers the Gas Tech LLC Agreement as part of the pleadings but declines to consider the FERC Order or GTI's statements in the *Cement-Lock* case at this stage.

Accepting as true all well-pleaded factual allegations, GTI and GRI have suffered a "concrete and particularized" injury in fact as a result of Defendants' breach of fiduciary duties, common law fraud, and civil conspiracy to commit fraud, which is sufficient to satisfy the injury in fact requirement, (s*ee, e.g.*, Compl. ¶¶ 184, 203, 211, Exs. A-D, F.) Although GTI and GRI's economic losses are sufficient injuries for standing purposes, the Complaint also alleges that the "Plaintiffs" have suffered non-economic losses of goodwill and customers. (*See, e.g.*, Compl. ¶¶ 204, 211.)[23] *See South East Lake View Neighbors v. Dep't of Housing and Urban Dev.,* 685 F.2d 1027, 1036 (7th Cir. 1982) (stating that "injury in fact" is not confined to "economic harm"). The court need not determine whether these non-economic losses are concrete and not speculative in this case, as GTI and GRI's economic losses are concrete and fairly traceable to the Defendants' conduct based on GTI and GRI's well-pleaded allegations. GTI has identified dozens of checks written directly to certain Defendants who now challenge GTI's standing, and Plaintiffs have alleged that both GTI and GRI paid funds that Defendants misappropriated. (See, e.g., Compl. Exs. A-3, F; ¶¶ 190, 192, 194, 196, 198). GTI and GRI have established the requisite "causal connection" between these economic losses and Defendants' tortious acts of breach of fiduciary duty, fraud, and conspiracy. (*See* Comp. ¶¶ 184, 203, 211.) Economic losses can always be redressed; GTI and GRI's claimed economic losses in this case are no exception. *See Wernsing v. Thompson*, 423 F.3d 732, 745 (7th Cir. 2005) ("[I]njuries compensable in monetary damages can always be redressed by a court judgment.") GTI and GRI's losses could, for example, be redressed by

---

[23]     That GRI and GTI, both not-for-profit entities, actually had customers or goodwill is not clear from the Complaint.

restoring them to the economic position they occupied before Defendants allegedly misappropriated their funds. Thus, GTI and GRI generally have standing to sue Defendants for breach of fiduciary duties, common law fraud, and civil conspiracy with the slight modifications discussed below.

On the other hand, for reasons similar to those the court explained earlier with respect to ECH's standing under RICO, the court concludes that ECH lacks standing to sue Defendants on these state law claims. Again, despite allegations that "Plaintiffs," collectively, have suffered from monetary losses, there is no indication in the Complaint that ECH made payments to Defendants so as to claim direct economic losses arising from such payments. To the contrary, the Exhibits to the Complaint establish that ECH has made no direct payments to Defendants. (*See, e.g.*, Compl. ¶¶ Exs. A-F.) The Complaint does allege that "Plaintiffs" have suffered from lost revenue, goodwill, and customers, (Compl. ¶ 204), but it does not appear that that these general allegations establish present concrete losses to ECH, as opposed to speculative losses. *See DH2, Inc. v. U.S. S.E.C.*, 422 F.3d 591, 596 (7th Cir. 2005) (citations omitted) (requiring plaintiff to establish that it is immediately in danger of a "direct injury" and stating that "speculation is not enough" to satisfy the injury in fact requirement). Even drawing an inference in favor of ECH on that issue, however, where there is no allegation that ECH made any payments to these Defendants, the connection between any injury to ECH—whether it is an economic or non-economic injury—and Defendants' conduct is unclear. The court is therefore not satisfied, based on the pleadings, that ECH's claimed injury can be fairly traced to Defendants' conduct.

With respect to the Unitel Defendants and Shyam Singh, the court notes that the only allegations relevant to claims against these Defendants relate to the Gas Tech Project. (Compl. ¶¶ 122-48.) When read in conjunction with the Gas Tech LLC Agreement, the Complaint does not identify any Plaintiff other than GRI that was victimized by any fraud in connection with that Project. As noted earlier, Plaintiffs concede that GRI is "the only entity which actually paid the money to the alleged wrongdoers for the Gas Tech Project, and the only entity that lost its money for the Gas

Tech Project." (Pl. Opp'n at 7.)   But it is GRI International–not GRI–which was a party to the Gas Tech LLC Agreement out of which the alleged breach of fiduciary duty and fraud arose, and Plaintiffs have neither pleaded a relationship to GRI International nor so much as mentioned GRI International in their Complaint.   The court concludes that these allegations are insufficient to establish that GRI was injured as a result of money it contributed to Gas Tech LLC under the Agreement.   Thus, because no Plaintiff presently a part of this lawsuit has standing to sue for allegedly unlawful conduct in connection with the Gas Tech Project, all of the claims that arise solely out of that Project must be dismissed.[24]

It also follows that GRI—the only Plaintiff requesting equitable accounting against Serge Randhava and UT/GT LLC in Count VII—does not have standing to request such a court order. In its claim for equitable accounting, GRI requests information GRI claims it is entitled to "under the terms of the Gas Tech LLC Agreement."  (Compl. ¶ 214.)  Because Plaintiff GRI is not a party to that Agreement, GRI has no claim for injury resulting from Randhava's or UT/GT LLC's alleged breach.  The court therefore dismisses without prejudice the breach of fiduciary duty claim (Count III) against Serge Randhava, the common law fraud claim against Shyam Singh, Peter Barone, Serge Randhava, and Richard Kao (Count V),[25] the Civil Conspiracy to Commit Fraud claim (Count VI) against the Unitel Defendants and Shyam Singh only, and the equitable accounting claim (Count VII) against Serge Randhava and UT/GT LLC.

---

[24]     The following claims arise solely out of the Gas Tech Project as they pertain to these Defendants:   Count VI (Civil Conspiracy to Commit Fraud) to the extent it is against Serge Randhava, Richard Kao, Unitel Technologies, and UT/GT; Count III (Breach of Fiduciary Duties) to the extent it is against Serge Randhava; Count V (Common Law Fraud) brought by Plaintiff GRI only against Shyam Singh, Serge Randhava, Peter Barone and Richard Kao and arising only out of the Gas Tech Project; and Count VII (Equitable Accounting) brought by Plaintiff GRI only against Serge Randhava and UT/GT and arising only out of the Gas Tech Project.

[25]     Although Peter Barone has not previously been grouped with the "Unitel Defendants," Count V is dismissed as against Peter Barone because the common law fraud alleged in Count V relates only to the Gas Tech Project.  This does not affect Count IV for Common Law Fraud, which is also brought against Peter Barone.

In summary, the court finds that GTI and GRI have standing to bring their state law claims of breach of fiduciary duty, common law fraud, and civil conspiracy to commit fraud against all Defendants except where the sole basis of the claim against the particular Defendant is the Gas Tech Project. ECH does not have standing to bring any state law claims. As a result, the claim of equitable accounting is dismissed without prejudice in its entirety; all state law claims are dismissed against the Unitel Defendants and Shyam Singh without prejudice; and Count V for common law fraud against Peter Barone is dismissed without prejudice.

## II.    Allegations of Fraud Under Rule 9(b)

Before considering whether Plaintiffs[26] have adequately pleaded their RICO and state law claims, the court will address whether Plaintiffs' allegations of fraud, which are relevant to both the RICO claims and the state law claim of common law fraud, satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b). *See Jepson, Inc. v. Makita Corp.,* 34 F.3d 1321, 1327 (7th Cir. 1994) (citations omitted) (confirming that Rule 9(b) applies to RICO violations that rest on the predicate acts of mail and wire fraud). Rule 9(b) requires a plaintiff to state "with particularity" the "circumstances constituting fraud" whenever fraud is alleged. FED. R. CIV. P. 9(b). Thus, Rule 9(b) requires a plaintiff to plead the "who, what, when, where, and how" of the communications perpetrating the alleged fraud. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). By requiring allegations that specify the "time, place, and content" of the communication perpetrating the fraud, Rule 9(b) is an exception to the otherwise liberal pleading standards of the Federal Rules. *See Graue Mill Dev. Corp. v. Colonial Bank & Trust Co. of Chicago*, 927 F.2d 988, 992-93 (7th Cir. 1991).

In a case such as this, where fraud claims are brought against multiple defendants, Plaintiffs

---

[26]    "Plaintiffs" as used from here forward refers only to GTI and GRI—the two Plaintiffs found to have standing for both their RICO and state law claims.

must provide detail concerning who was involved in each fraudulent activity and may not "[lump] all the defendants together." *See Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990). Essentially, the complaint must reasonably notify each defendant of his or her role in the fraudulent scheme alleged. *See Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992). All of the remaining Defendants that have moved for dismissal–the Barone Defendants, the Jones Defendants, the Rehmat Defendants,[27] Anthony Lee, Lloyd Lee, Lois Barone, Susan Lee, and Reaction Kinetics—contend that Plaintiffs have not pleaded their fraud claims with the requisite particularity. (Barone Mot. at 8-9, 12-13, 14-15; L. Barone Mot. at 3-5, Jones Mot. at 23-24; A. Lee Mot. at 2; L. Lee Mot. at 2; S. Lee Mot. at 3; Rehmat Mot. at 24-25.) Plaintiffs, on the other hand, argue that the Complaint satisfies Rule 9(b)'s particularity requirement by specifying which Defendants were involved in each of the four allegedly fraudulent schemes, the individuals associated with each sham entity, the sham entities involved in each scheme, the amount that each sham subcontractor stole from Plaintiffs, and details of the fraudulent payments that Plaintiffs made

---

[27] Several of the Defendants have argued that Plaintiffs are barred from pursuing this case by a settlement agreement in which GTI allegedly released Amir Rehmat from liability for "any and all claims" and "causes of actions" from "known and unknown" injuries. (Rehmat Mot. at 27-29; Settlement and Release of All Claims at 1, Ex. B to Rehmat Mot.; A. Lee Mot. at 2; L. Lee Mot. at 2; S. Lee Mot. at 2.) Assuming this argument can properly be made as part of a motion to dismiss (*but see Papa John's Intern., Inc. v. Rezko*, No. 04 C 3131, 2006 WL 566468 (N.D. Ill. Mar. 3, 2006) (Moran, J.) (collecting cases reaching different results on the question whether it is proper to grant a motion to dismiss that rests on an affirmative defense, including release)), the court is not inclined to entertain it at this stage. It is well-established that a general release is valid for all claims the signing party had knowledge of or could have discovered with "reasonable inquiry." *See Fair v. Int'l Flavors & Fragrances, Inc.*, 905 F.2d 1114, 1116 (7th Cir. 1990) (citations omitted); *Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 21, 799 N.E.2d 756, 762 (1st Dist. 2003) (stating that a general release will not apply to unknown claims which the party could not have contemplated when giving the release). Without a fuller record, the court cannot determine whether Thomas O'Laughlin had knowledge or could have discovered the claims brought in this lawsuit at the time he signed the release on Sept. 30, 2002. The court also declines Defendants' invitation to order a limited period of discovery focused on the circumstances of the release. (Rehmat Reply at 13.) Discovery in this case is well underway. If information revealed in discovery supports dismissal of some Defendants on the basis of the release, the court will entertain a motion for summary judgment on that basis.

to each sham subcontractor, such as purchase order, invoice number, date, check number, and amount of each fraudulent payment. (Pl. Opp'n at 9, 45-46.) The court will examine whether Plaintiffs have met the requirements of Rule 9(b) as to each of the underlying fraud claims.

## A.    RICO Predicate Acts Sounding in Fraud

Mail fraud is committed whenever someone, "having "devised or intending to devise any scheme" to defraud or in order to obtain money or property by false or fraudulent pretenses, uses the mails or "knowingly causes [something] to be delivered by mail" for the purposes of executing a scheme to defraud. 18 U.S.C. § 1341. "It is well settled that a defendant 'causes' a mailing for purposes of 18 U.S.C. § 1341 either when he makes use of the mails or when he causes someone else to do so." *United States v. Castor*, 558 F.2d 379, 385 (7th Cir. 1977) (citation omitted); *see U.S. v. Swan*, 250 F.3d 495, 500 (7th Cir. 2001) ("Swan did not have to mail the check himself to be guilty of mail fraud. He only needed to cause it to be mailed or to commit some act that would cause the mailing of the check to be reasonably foreseeable.") For example, Plaintiffs allege that "Defendants directly transmitted, and caused to be transmitted, documents (including invoices, bills, and checks) arising from the above-described fraudulent conduct to and from Plaintiffs and among the defendant entities . . . through the United States mails . . . ." (Compl. ¶ 83; *see also* ¶¶ 65-66, 89, 90, 93, 103, 108, 114, 157, 165.) Plaintiffs have repeatedly alleged that Defendants, many of whom resided in different states, submitted fraudulent subcontracts, invoices, and bills to Plaintiffs. (*See, e.g., id.* ¶¶ 65-66, 83, 89, 90, 93, 103, 108, 114, 157, 165.) It is, therefore, reasonably foreseeable that Plaintiffs would respond to these alleged fraudulent invoices and bills by sending payment through the mail.

While Defendants' alleged conduct clearly falls within the description of mail fraud, Plaintiffs still must satisfy Rule 9(b) and plead, "within reason," the "time, place and content" of the mail communication, "identify[ing] the parties" to those communications, and alleging facts from which

the court can reasonably infer the Defendants' fraudulent intent. *See Jepson*, 34 F.3d at 1328. Plaintiffs' allegations easily meet the "time, place and content" test. *See Midwest Grinding Co.*, 976 F.2d at 1020 (quoting *Graue Mill Dev.*, 927 F.2d at 992). The Exhibits to the Complaint (lists of checks that Plaintiffs sent to Defendant subcontractors) provide extensive detail concerning the mail communications that Defendants "caused" to be transmitted to further their scheme to defraud in violation of § 1341. *See Castor*, 558 F.2d at 385. For each check (more than 200, even after disregarding those pertaining to the Gas Tech Project), Plaintiffs have identified the subcontractor paid, the invoice number (if available), the check number, the dollar amount of the check, the date of payment, the method of transport (U.S. Mail), and the mailing date. (*See id.*) *See Alumax Mill Prods., Inc. v. Krzysztofiak*, No. 96-C-5012, 1997 WL 201555, * 3 (N.D. Ill. Apr. 17, 1997) ("Plaintiff . . . details the date and number of the invoices, the exact amount charged and overbilled, and that the invoice was transmitted to plaintiff through the United States mails. Plaintiff also alleges that the fraudulent invoices were specifically prepared and mailed by United Volume.")

Defendants urge that Plaintiffs' allegations are nevertheless inadequate because they present no basis for the inference that Defendants engaged in the scheme of mail fraud with fraudulent intent. (Barone Mot. at 8.) They rely on *Jepson*, but the court concludes that case is not analogous; the plaintiff there alleged only "multiple instances" of the use of the mails and failed to identify who was contacted by mail and when. *See Jepson*, 34 F.3d at 1328. Here, not only does Plaintiff allege that the checks identified "were caused to be mailed in furtherance of the scheme to defraud," (Compl. ¶ 83)*,* but Defendants' fraudulent intent can be inferred from the initial submission of fraudulent invoices that Plaintiffs allege. It is true that Plaintiffs do not specify exactly which Defendant caused Plaintiffs to send checks by mail. To the extent these particular details are exclusively known by Defendants, Plaintiffs may be relieved of the duty to plead this information. *See Jepson*, 34 F.3d at 1328. In any event, Plaintiffs have specified the payee of each check, and it is  reasonable to infer that the payee is the very party from whom Plaintiff received the

alleged fraudulent invoice or bill. Further, Plaintiffs have extensively identified the individual Defendants' associations with each of the Defendant subcontractors. (Compl. ¶¶ 22-46.) Plaintiffs' allegations are thus sufficient to apprise the Defendants of their alleged role in the mail fraud.

The other predicate acts alleged fall under the National Stolen Property Act, 18 U.S.C. §§ 2314 and 2315, which prohibits the interstate transportation of stolen goods. Section 2314 prohibits the transportation or transmission of goods or money in a value in excess of $5,000 that are known to have been "stolen, converted or taken by fraud," and also prohibits, as a part of a scheme to defraud, obtaining or transporting money, causing money to be transported, or inducing a person to transport in interstate commerce money or property in a value in excess of $5,000 to execute or conceal the scheme to defraud. 18 U.S.C. § 2314. Section 2315 prohibits possession, concealing, storing, bartering, selling or disposing of money or goods across state or national borders with knowledge that the money or goods were "stolen, unlawfully converted or taken." 18 U.S.C. § 2315. As the court reads the Complaint, Plaintiffs allege that, as part of their scheme to defraud, Defendants knowingly caused the Plaintiff entities to transport money to Defendants in excess of $5,000 in interstate or foreign commerce, Defendants themselves allegedly transported or received funds across state or national boundaries with knowledge that the money was stolen from Plaintiffs.

Violations of § 2314 and § 2315 do not, "in and of themselves, constitute allegations of fraud that must be pled with specificity." *See Perlman v. Zell*, 938 F. Supp. 1327, 1348 (N. D. Ill. 1996) (citation omitted); *see also P.M.F. Servs., Inc. v. Grady*, 681 F. Supp. 549, 554 (N. D. Ill. 1988) (having found "no case specifically discussing whether allegations of violations of Section 2315 in a RICO Complaint must comply with 9(b)," court notes that the receipt of stolen property "is not 'fraud,'" and concludes that Rule 9(b) does not apply). Cases addressing violations of §§ 2314 and 2315 as RICO predicate acts have required particularity where the funds that have been transported are alleged to have been obtained by fraud. *See Perlman*, 938 F. Supp. at 1348-49

(collecting cases). In other words, Plaintiffs do not need to plead all elements of a violation of §§ 2314 or 2315—e.g., the circumstances of the transport and Defendants' knowledge—with particularity, but do need to plead with particularity the acts of fraud by which the funds were obtained. *See id.* at 1348-49. The court follows this approach here and finds the Plaintiffs' allegations as to the underlying fraud sufficiently particular for the same reasons that the mail fraud allegations are sufficient.

Plaintiffs allege numerous instances in which Defendants have submitted invoices to Plaintiffs for services and projects that were not rendered and refer specifically to Exhibits listing payments made in response to these invoices. (*See, e.g.*, Compl. ¶¶ 64-67, 92-93, 97, 112-114, 157-158, Exs. A-D, F.) These allegations describe the content of the fraudulent communication as invoices for payment, state the technology to which the invoice related, and refer to the Exhibit that provides further detail on the content of the communications in the form of the amount of money paid under these invoices. (*See, e.g.*, *id.* ¶¶ Exs. A-D, F.) Plaintiffs do list a number of individual Defendants and Defendant entities in these allegations. It is true that "lump[ing] all Defendants together" is not sufficiently particular, *Sears*, 912 F.2d at 893, but from Plaintiffs' allegations describing which Defendants are associated with which subcontracting entities, the court can reasonably infer which Defendants named in each of these allegations made fraudulent communications.

Plaintiffs have not explicitly alleged that Defendants caused all of these checks to be transported in interstate or foreign commerce, and Plaintiffs do admit that some of the "sham entities" are located in Illinois, where Plaintiffs are based. (Compl. ¶¶ 1, 3.) The Complaint does allege, however, that many of the sham entities were located in places other than Illinois and that "Defendants knowingly caused funds to be stolen from the Plaintiffs in Illinois and to be transported to bank accounts located in both the United States and Canada." (*Id.* ¶¶ 3, 165.) Transportation of funds in interstate commerce can be inferred, as well, from many alleged instances in which

47

Plaintiffs have identified payments and the distant locations of the entities to which the payments were made.[28]  Indeed, none of the checks listed in the exhibits attached to Plaintiffs' Complaint were paid to the Defendant entities based in Illinois—Resource Recovery Consultants, Reaction Kinetics Consultants, and Barone Consulting Group.  (*Id.* ¶¶ 35-37, Exs. A-D, F.)  The court concludes that Plaintiffs have pleaded the RICO predicate acts of mail fraud and interstate transport of stolen goods under § 2314 and § 2315 with the requisite particularity.  The court therefore considers as RICO predicate acts: (a) some 200 alleged instances of mail fraud under § 1341; (b) numerous instances in which Defendants caused the Plaintiff entities to transport money to Defendants in excess of $5,000 in interstate or foreign commerce as a part of their scheme to defraud; and (c) instances in which Defendants allegedly transported money in excess of $5,000 across borders with knowledge that the funds were stolen or taken from Plaintiffs.

## B.    Common Law Fraud

A cause of action for common law fraud likewise must be pleaded with particularity.  Such a claim requires Plaintiff to allege: "(1) a false statement of material fact by the defendant; (2) the defendant's knowledge that the statement was false; (3) the defendant's intent that the statement induce the plaintiff to act; (4) the plaintiff's reliance on the truth of the statement; and (5) damages resulting from the plaintiff's reliance on the statement."  *Addison v. Distinctive Homes, Ltd.*, 359 Ill. App. 3d 997, 1000, 836 N.E.2d 88, 92 (1st Dist. 2005) (citing *Connick v. Suzuki Motor Co., Ltd.,* 174 Ill.2d 482, 496, 675 N.E.2d 584, 591 (1996)).  To satisfy Rule 9(b), a plaintiff claiming fraud must

---

[28]    For example, Plaintiffs allege fraud from the submission of false invoices causing Plaintiff GTI to pay funds for work purportedly related to the GTI or Cement-Lock Technology (Compl. ¶ 65.)  Though Plaintiffs are not explicit, in this instance, that the funds Plaintiff GTI was caused to pay as a part of Defendants' fraudulent scheme were transported through interstate or foreign commerce, the court can infer as much from Exhibit B, which shows thirty-three checks mailed through the U.S. Mails to six different Defendant entities which Plaintiff has otherwise identified as located outside of Illinois.  In other instances, Plaintiffs are explicit that the checks Defendants caused Plaintiffs to pay were transported in interstate and foreign commerce.  (*See, e.g., id.* ¶¶ 91-97) (describing fraudulent scheme relating to ACIMET research and alleging that certain Defendants caused GTI to mail checks to ANE Research in Surrey, British Columbia).

allege in detail the person making the representation, the "time, place, and content" of the misrepresentation, and how the misrepresentation "was communicated to the plaintiff." *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (citations omitted); *see also Midwest Commerce Banking Co. v. Elkhart City Centre*, 4 F.3d 521, 523 (7th Cir. 1993) (citation omitted) (describing requirements of Rule 9(b) and stating that plaintiff must allege that "misrepresentation, *omission*, or other action or inaction" was fraudulent) (emphasis added). The remaining Defendants against whom Plaintiffs claim common law fraud are Amir Rehmat, Peter Barone, Tony Lee, Lois Barone, Charles Wayne Jones, Kathreen Jones, Jinnet Hemani, and Zuli Rehmat. As explained here, the court concludes Plaintiffs have met the standard of Rule 9(b) in pleading common law fraud against these individual Defendants with the exception of Tony Lee.

In many instances, the Complaint does not specify the date of an alleged fraudulent omission or representation, or simply alleges that the "Defendants," collectively, failed to disclose material facts to Plaintiffs. In addition, however, for each Defendant charged with fraud, with the exception of Tony Lee, Plaintiffs had set forth at least one sufficiently detailed allegation of fraud. As to each of these Defendants, Plaintiffs allege either an intentional omission or a willful misrepresentation of material fact, specify the date on which it occurred, and identify nature of the misrepresentation or omission. The following are examples of these sufficiently particular allegations:

- On or about April 17, 2001, defendants Amir G. Rehmat, G. Michael Morin, S. Peter Barone, Lois A. Barone, Charles Wayne Jones, Kathreen L. Jones, Minaz Rehmat, Resource Recovery Consultants, Wayne and Associates and others, known and unknown, signed and executed a Declaration of Trust in Richmond, British Columbia, Canada that confirmed specific ownership and proprietary interests in the TEFES Trust, for the purpose of defrauding and disposing of stolen funds from GTI and GRI. Defendants intentionally omitted to disclose the existence of the TEFES Trust, or that of defendants' ownership shares in that Trust, to Plaintiffs. (Compl. ¶ 186.)

- On or about February 8, 2001, May 29, 2001, and July 15, 2002, defendants Amir Rehmat, Zuli Rehmat, and Jinnet Hemani signed and executed Subcontracts for Research between ANE Research Corporation and ECH. Defendants willfully misrepresented material facts in the Subcontracts to GTI and ECH, namely, that ANE Research would in fact perform and

had the capability to perform, the services and research described in the Subcontracts. (*Id.* ¶ 189.) At relevant times, Defendants Amir Rehmat, Jinnet Hemani, and Zuli Rehmat intentionally omitted to disclose or to inform Plaintiffs of material facts, namely that ANE Research could not and did not perform any services described in the Subcontracts and that the monies paid by GTI and GRI to ANE Research were distributed and kicked-back to Defendants for their personal use and benefit. (*Id.* ¶ 190.)[29]

The court is satisfied that Plaintiffs' allegations are sufficiently specific to state a claim of fraud against Amir Rehmat, Peter Barone, Lois Barone, Charles Wayne Jones, Kathreen Jones, Jinnet Hemani, and Zuli Rehmat.

As to Tony Lee, a variety of allegations within the Complaint mention Tony Lee in conjunction with a material misrepresentation or omission: for example, that he prepared or caused to be prepared "false and fraudulent invoices and bills submitted to Plaintiffs." (*See, e.g., id.* ¶¶ 64-66.) These allegations are general; they do not give any indication of the named individuals' role in the alleged fraud; and they do not specify the time period in which the alleged fraud occurred other than by reference to the Exhibits detailing Plaintiffs' payments. These general allegations regarding misrepresentations of material facts that "Defendants knowingly made" are insufficiently particular to allege fraud against Tony Lee. (*See id.* ¶¶ 81, 82.) In some paragraphs, Plaintiffs lump Tony Lee with a group of other Defendants and allege that these Defendants made certain misrepresentations; but the court remains uncertain which of these misrepresentations, if any, are alleged to have been made by Tony Lee and when these misrepresentations were made. (*See id.* ¶ 162.) Likewise, allegations that Tony Lee "fraudulently caused" Plaintiffs to pay certain sums for work not performed are also insufficient, as they fail to identify the misrepresentation or omission perpetrating the fraud. (*See id.* ¶¶ 158-59.) Finally, Plaintiffs allege that on February 5, 2001, Tony

---

[29] Elsewhere in the Complaint, Plaintiffs alleged that the subcontracting entities are unable to perform the work for which they contracted, (*e.g.*, Compl. ¶¶ 26-31), confirming that the misrepresentations and omissions Plaintiffs allege amount to false statements of existing fact rather than mere false promises about future conduct. See *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 168, 545 N.E.2d 672, 682 (1989) (distinguishing promises to perform future acts, which generally do not constitute fraud, from misrepresentations of existing fact).

Lee prepared and submitted an invoice for marketing services rendered by Reaction Kinetics Consultants to TEFES Pure Tech for services that Tony Lee knew were not rendered. (*Id.* ¶ 199.) But Plaintiffs have not alleged that Tony Lee, or anyone else, ever submitted this invoice for payment. Thus, unlike other allegations supporting Plaintiffs' common law fraud claims, this allegation is not sufficiently particular. *Hefferman*, 2006 WL 2973677, *5 (stating that Rule 9(b) requires plaintiff to plead how the misrepresentation "was communicated to the Plaintiff"). The court therefore dismisses the common law fraud claim against Tony Lee without prejudice.

## III. RICO Claims

### A. Statute of Limitations

RICO claims are subject to a four-year statute of limitations. *Fujisawa Pharm. Co., Ltd. v. Kapoor*, 115 F.3d 1332, 1338 (7th Cir. 1997). The limitations period begins to run for a RICO violation from the time the plaintiff knew of his injury—even if Plaintiff had not yet discovered the alleged pattern of racketeering—or should have known of his injury. *See McCool v. Strata Oil Co.*, 972 F.2d 1452, 1464-65 (7th Cir. 1992). Plaintiffs allege that they "did not discover and should not have reasonably discovered that their damages were attributable to fraud or to interstate transport of stolen property until sometime in mid-2002." (Compl. ¶ 175.) Defendants argue that Plaintiffs' allegation merely states when Plaintiffs learned that their injuries were caused by a pattern of racketeering as opposed to when Plaintiffs knew of their injuries. (Barone Mot. at 10-11.) Plaintiffs respond that this allegation "expressly allege[s] that they did not discover their injuries with respect to Defendants' fraudulent schemes until sometime in mid-2002." (Pl. Opp'n at 34.)

In the court's view, this particular allegation is not explicit as to when Plaintiffs actually discovered their injuries. In light of the nature of the alleged scheme, however, in which Plaintiffs were paying numerous subcontractors for work that was never performed, it is reasonable to infer that Plaintiffs did not discover their injuries until mid-2002. The court presumes that Plaintiffs, who first made payments to Defendants in 1996, would not have continued to make frequent payments

to the Defendants if they were aware that they were incurring injury as a result. Plaintiffs' payments essentially ceased in mid-2002 (with only a few payments made in October of 2002). (*See* Compl. ¶¶ Exs. A-D, F.) The court infers that Plaintiffs are indeed claiming that they were not aware or should not have reasonably been aware of their injury until mid-2002. The Complaint, filed in 2005, was timely.

### B.    Substantive Racketeering

Count I of Plaintiffs' Complaint alleges substantive racketeering by Peter Barone, Amir Rehmat, and Tony Lee under 18 U.S.C. §§ 1962(c) and 1964.[30] Section 1962(c) makes it unlawful for "any person employed by or associated with [an] enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  "To state a claim under § 1962(c), a RICO plaintiff must show the '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Richmond v. Nationwide Cassel L.P.* 52 F.3d 640, 644 (7th Cir. 1995) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985)).

Defendants claim that Plaintiffs fail to state a RICO claim because they do not sufficiently allege the existence of an enterprise as required by § 1962(c) and fail to allege a pattern of racketeering activity.  (Barone Mot. at 5-11; Jones Mot. 15-23; Rehmat Mot. at 15-17.)  Plaintiffs contend that they have adequately alleged an association-in-fact enterprise and a pattern of racketeering activity with closed-ended continuity.  (Pl. Opp'n at 19-28.)

### 1.    Association-in-Fact Enterprise

An "association in fact" is an enterprise characterized by a "union or group of individuals associated in fact although not a legal entity,"  18 U.S.C. § 1961(4).  To qualify as a RICO enterprise, the association-in-fact must be comprised of persons associated together "'for a

---

[30]    As discussed above, the court no longer considers ECH as a party to this count.

common purpose of engaging in a course of conduct.'" *Richmond*, 52 F.3d at 644 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). A RICO enterprises may be a formal or informal organization, *Bachman v. Bears, Stearns & Co.*, 178 F.3d 930, 931 (7th Cir. 1999), but the enterprise must have structure. *Richmond*, 52 F.3d at 644. In other words, there must be "an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making." *Id.* The enterprise must further have "goals separate from the predicate acts themselves." *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000). Further, to be liable under § 1962(c), the members of the association-in-fact must participate in the operation or management of the enterprise. *Richmond*, 52 F.3d at 646 (citation omitted). Plaintiffs have adequately pleaded an association-in-fact enterprise comprised of Amir Rehmat, Peter Barone, and Tony Lee.

Plaintiffs have alleged that, in addition to overseeing and coordinating schemes to defraud Plaintiffs, the enterprise engaged in the legitimate activities of developing, marketing, and testing "the efficacy and production capabilities of the Cement-Lock and other valid Technologies, including projects known as ACIMET, Perpetual Light, and Gas Tech, as well as [undertaking] legitimate and approved research projects." (Compl. ¶ 169.) In addition, the enterprise allegedly conducted a variety of activities "with legitimate and competent sub-contractors and research entities who conduct valid work and research," including negotiating and executing sub-contracts and securing funding for the sub-contractors' research. (*Id.* ¶ 171.) In Defendants' view, Plaintiffs have merely recast parts of GTI's mission statement as the purpose of the enterprise; Defendants contend that the alleged enterprise has not undertaken any acts as an enterprise that are independent from businesses formed by the entities for which the alleged enterprise members worked. (Barone Mot. at 6-7; Jones Mot. at 15-18; Rehmat Mot. at 14-17.) If, as Defendants claim, all of the enterprise's alleged activities were, in fact, undertaken by the Plaintiff entities, there might be a basis for this challenge. (Barone Reply at 2-3; Rehmat Reply at 9.) But at this stage, the court accepts Plaintiffs'

allegations as true. The Plaintiffs need only allege a purpose of the RICO enterprise separate and apart from the predicate acts, which Plaintiffs have done. *See Stachon*, 229 F.3d at 675.

Plaintiffs here have described the structure of the enterprise as including all Defendants, not just the members of the association-in-fact. Whatever the wisdom of this approach, the court concludes that Plaintiffs have adequately pleaded the structure of the RICO enterprise. (*See* Compl. ¶ 166.) Plaintiffs allege that each member in the enterprise fulfills a "specific and necessary role to carry out and facilitate its purpose." (*Id.*) Specifically, Amir Rehmat allegedly used his executive position in ECH and GTI to devise, manage, supervise, and perpetrate the fraudulent scheme. Tony Lee and Peter Barone worked closely with Amir Rehmat in implementing the fraudulent concealment, and all three of these men set up sham entities, directed others to set up sham entities, and recruited others to take part in the scheme. (*Id.*) From Plaintiffs' reference to Amir Rehmat's executive positions at ECH and GTI, it is reasonable for the court to infer that Amir Rehmat sits highest in the hierarchy of the enterprise. Similarly, from the allegation that Tony Lee and Peter Barone both worked closely together with Amir Rehmat for the same purpose, the court infers that Lee and Barone functioned at the same level in the enterprise's hierarchy under Amir Rehmat's direction.

Peter Barone contends that the Complaint does not adequately allege his participation in the operation or management of the RICO enterprise such that he could be considered an association-in-fact member. (Barone Mot. at 7-8.) Barone points to the lack of allegations that he "signed any contracts, controlled any funds, or issued any invoices on behalf of the enterprise." (*Id.* at 8.) Barone cites *Slaney v. The International Amateur Athletic Federation*, 244 F.3d 580, 598 (7th Cir. 2001), in which the court found that the plaintiff did not adequately allege that the United States Olympic Committee (USOC) was an enterprise member because the allegations did not support that the USOC could have directed the enterprise's affairs but rather only that the USOC performed services for the enterprise. *Id.* In the court's view, *Slaney* is distinguishable. The Complaint here

alleges that Peter Barone, along with Amir Rehmat and Tony Lee, "organized, oversaw, and planned the schemes to defraud." (Compl. ¶ 21.) Even if Peter Barone was not the upper-most manager of the enterprise, he may still be liable for operating and managing the enterprise. *See MCM Partners, Inc. v. Andrews-Bartlett & Assocs. Inc.*, 62 F.3d 967, 977 (7th Cir. 1995) (stating that "lower-rung participants in the enterprise" may be liable if "under the direction of upper management.") The Complaint also states that Peter Barone, along with Tony Lee, not only implemented the scheme to defraud but also directed the formation of sham entities in order to perpetrate the scheme to defraud. (Compl. ¶ 166.) Assuming Plaintiffs' allegations are true, as this court must, they are sufficient to establish that Peter Barone was not merely performing services for the enterprise but was directing its affairs.

### 2. Pattern of Racketeering Activity

Plaintiffs also must allege that the enterprise conducted a pattern of racketeering activity. *Richmond*, 52 F.3d at 644. A pattern of racketeering activity requires at least two predicate acts of racketeering within ten years. 18 U.S.C. § 1961(5). To establish a pattern, the plaintiff must sufficiently allege continuous criminal activity and that the predicate acts are related. *See Roger Whitmore's Automotive Servs., Inc. v. Lake County, Illinois*, 424 F.3d 659, 672 (7th Cir. 2005). If the course of criminal conduct has ended, the plaintiff must demonstrate "close-ended continuity," in other words, that a series of related predicate acts occurred over a substantial but closed period of time. *See id.* at 672-73; *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 779-80 (7th Cir. 1994) (citation omitted).

In order to ensure that RICO claims address "long-term criminal conduct," the following factors are relevant: (1) the number of predicate acts; (2) the variety of predicate acts; (3) the length of time over which they were committed; (4) the number of victims; (5) the presence of separate schemes; and (6) the occurrence of distinct injuries. *See Vicom, Inc.*, 20 F.3d at 780 (citation omitted). Defendants dispute that Plaintiffs have sufficiently established any of the factors relevant

to close-ended continuity. (Jones Mot. at 21-23; Rehmat Mot. at 19-21.) Plaintiffs claim that their allegations are sufficient under each one of the factors relevant to closed-ended continuity. (Pl. Opp'n at 25-28.) Having concluded that Plaintiffs pleaded mail fraud and the interstate transport of stolen goods with the necessary particularity, the court considers whether Plaintiffs have sufficiently stated a pattern of racketeering activity with closed-ended continuity based on these alleged predicate acts.

As stated in *Morgan v. Bank of Waukegan*, 804 F.2d 970 (7th Cir. 1986), the Seventh Circuit case initially setting forth the factors for closed-ended continuity, no single factor is necessarily determinative and the determination depends on the "fact and circumstances" of a particular case. *See id.* at 975-76. Plaintiffs here have alleged at least 200 hundred occurrences of the predicate acts, which the court finds significant. Even removing from consideration payments made in connection with the Gas Tech Project, for which no Plaintiff here has standing to sue, the 200 acts are instances where fraudulent invoices submitted by Defendants caused Plaintiffs to use the mails and to transport money to Defendant subcontractors in interstate or foreign commerce in the execution of a scheme to defraud Plaintiffs. *See* 18 U.S.C. §§ 2314, 1341. In addition, Plaintiffs have alleged multiple instances where, in violation of §§ 2314 and 2315, Defendants transferred and received money in excess of $5,000 that Defendants knew to be stolen or taken from Plaintiffs. (*See, e.g.*, Compl. ¶¶ 75, 77.) Plaintiffs allege that this pattern began as early as 1993 and continued as late as January 2005. (Compl. ¶ 165.) Even if the predicate acts are determined to have ceased in late 2002, when Plaintiffs made their final payments to the Defendant entities, the period of time alleged remains substantial.

As explained earlier, the court has concluded that only GTI and GRI were victims for the purpose of analyzing the alleged pattern of racketeering activity. As to the alleged injuries, each fraudulent act alleged to constitute mail fraud or the transport of stolen goods resulted in a distinct injury to Plaintiffs given that additional money was fraudulently obtained or transported with each

56

act.  *See Fortney v. Kuipers*, No. 98-C-5387, 1999 WL 102772, *8 (N.D. Ill. Feb. 22, 1999) (stating that distinct injuries occurred each time additional money was fraudulently transferred in each of the twenty distinct acts alleged).

With respect to the final factor, the presence of separate schemes, *Morgan* is instructive. The plaintiffs in *Morgan* alleged that defendants committed several acts of mail fraud to further a scheme to defraud plaintiffs.  *See* 804 F.2d at 976.  The court found the acts distinct, as some related to the initial loan transaction, and others related to two separate foreclosure sales that occurred two years apart.  *See id.*  Even if the acts were viewed as a part of "a single grand scheme," because they were ongoing for a period of nearly four years and were distinct, the pattern requirement was still satisfied.  *See id.* at 975-76 (untenable to permit defendants to escape RICO liability because their  acts related to "a large and ongoing scheme").

This case presents comparable facts.  Even if Plaintiffs' allegations are read as charging Defendants with one grand scheme to defraud Plaintiffs of funds intended to be used for the research and development of natural gas technologies, the predicate acts were distinct.  Not only did the fraudulent subcontracts and invoices at issue relate to different technologies, but the predicate acts relating to certain technologies took place in temporal proximity to each other, while the scheme as a whole occurred over a period of several years.  To illustrate, Exhibit C reveals payments the Plaintiffs were allegedly caused to make relating to the Cement-Lock Technology from 1998-2002, while Exhibit F reveals that payments related to the TDP Technology occurred throughout 2002, and payments relating to the Thermogenics Technology/Autofluff occurred from 1995 to 1997.  (*See* Compl. ¶¶ Exs. C, F.)  Defendants' predicate acts therefore stand in stark contrast to situations where predicate acts are considered to lack the requisite continuity, such as the paradigmatic case when a defendant commits two acts of mail fraud in falsifying an application for a single loan.  *See Morgan*, 804 F.2d at 976.

Here, as in *Morgan*, Plaintiffs have alleged a single grand scheme with many distinct

predicate acts occurring over an extended period of time. *Compare Roger Whitmore's Automotive Servs. Inc.*, 424 F.3d at 673 (determining that a single scheme over two years with a confined number of victims did not constitute a pattern of racketeering where the number of predicate acts was "fairly small"). The large number and continuity of predicate acts also distinguish this case from the distinctly "one-shot" scheme in *Gamboa v. Velez*, 457 F.3d 703 (7th Cir. 2006), where the alleged pattern of racketeering activity did occur over a period of several years but was a part of a "one-time endeavor to wreak havoc upon all matters linked to a single murder investigation." *See id.* at 708. Weighing all of the relevant factors, the court is satisfied that Plaintiffs have adequately alleged, based on the predicate acts of mail fraud and interstate transport of stolen goods, both the continuity of and relationship between acts that is necessary for a pattern of racketeering activity. *See Morgan*, 804 F.2d 975-77.

## C. Racketeering Conspiracy

Count II alleges a racketeering conspiracy against all Defendants under §§ 1962(d) and 1964.[31] To state a claim under § 1962(d), the plaintiff must allege that "(1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish these goals." *See Slaney*, 244 F.3d at 600. All remaining Defendants argue that Plaintiffs have not sufficiently alleged a conspiracy to violate RICO. The Barone Defendants, Lois Barone, and Susan Lee contend more specifically that Plaintiffs failed to meet heightened pleading requirements of Rule 9(b) as to them. (Barone Mot. at 9-10; L. Barone 2-4; S. Lee at 4.)

The Seventh Circuit has not required the pleading of claims under § 1962(d) with particularity, nor has this court. *Goren v. New Vision Intern'l Inc.*, 156 F.3d 721, 733 n.10 (7th Cir.

---

[31] Neither ECH, the Unitel Defendants (Serge Randhava, Richard Kao, Unitel Technologies, and U/GT LLC), nor Shyam Singh remain as parties to this count.

1998); *Cement-Lock*, 2005 WL 2420374, at *10 ("Plaintiff has sufficiently alleged a conspiracy against all Defendants by alleging that all Defendants 'conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the Enterprise' . . .and 'agreed to the commission of [predicate] acts.'") Further, a defendant can conspire with an association-in-fact enterprise even where that defendant is not a part of the enterprise, *Cement-Lock*, 2005 WL 2420374, at *10, so long as the defendant has agreed that someone would commit the predicate acts. *See Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 785 (7th Cir. 1999). Plaintiffs here adequately allege that "Defendants willfully combined, conspired, and agreed with one another and with others to violate [1962(c)], that is, to conduct and/or participate, directly or indirectly, in the conduct of the affairs of the Enterprise . . . and agreed with one another that someone would commit at least two predicate acts to accomplish the goals of this conspiracy." (Compl. ¶ 178.) The Complaint further identifies the object of the conspiracy to violate RICO and the specific predicate acts alleged to comprise the pattern of racketeering activity. (*Id.* ¶¶ 178-79.)

Citing *Goren*, 156 F.3d at 733, Lois Barone contends that allegations concerning the collective conduct of Defendants are insufficient to plead a conspiracy and that conclusory allegations about a conspiracy are also insufficient. (Barone Reply at 3-4.) While Plaintiffs' Complaint may name groups of Defendants or multiple Defendants in factual allegations, the court infers that this is because all Defendants named in the particular allegation are alleged to have engaged in similar conduct. Though many Defendants are alleged to have engaged in the same conduct, the Complaint does not run afoul of *Goren*, where the complaint stated the conduct of "defendants" generally, without identifying which of them took any particular action. *Id.* at 733. Here, in contrast, the Plaintiffs' general allegations are supplemented by factual allegations describing individual Defendants' conduct (albeit sometimes more than one). *See id.* at 732 (noting the plaintiff's failure to "allege any facts indicating an agreement by [defendants] as to which roles they would play in the enterprise").

Defendants do not dispute that a conspiracy can be inferred from the facts. It is sufficient here that the allegations enable the court to infer each Defendants' agreement to the conspiracy. *See United States v. Cea,* 914 F.2d 881, 886 (7th Cir.1990). To illustrate, using those Defendants that have specifically challenged the conspiracy allegations as examples, Plaintiffs allege that Peter Barone, Lois Barone, and Susan Lee—and other individually identified Defendants—prepared or caused to be prepared certain false invoices and fraudulent subcontracts. (Compl. ¶¶ 64-66.) The Complaint further alleges that these specific Defendants had a role in setting up sham entities, (*id.* ¶¶70, 71, 166), that they received stolen funds, (*id.* ¶ 79), and that Peter Barone transported stolen funds. (*Id.* ¶ 90.) The court is satisfied that together with the general allegation as to Defendants' agreement, the allegations describing the individual Defendants' acts allow the inference that each Defendant agreed to maintain an interest in or control of the enterprise or to participate in the affairs of the enterprise, and that someone would commit at least two predicate acts to accomplish these goals.

## IV. State Law Claims

### A. Statute of Limitations

Defendants contend that Plaintiffs' state law claims were not timely filed. (Jones Mot. at 16; Rehmat Mot. at 23-24.*)* The statute of limitations for Plaintiffs' state law claims is five years. *See* 735 ILCS 5/13-205. In Illinois, the statute of limitation begins to run when the plaintiff knows or reasonably should have known of the injury that was wrongfully caused. *See Knox College v. Celotex Corp.*, 88 Ill.2d 407, 415-16, 430 N.E.2d 976 (1981) ("At some point the injured person becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved. At that point, under the discovery rule, the running of the limitations period commences.") Plaintiffs have not specified in the sections of the Complaint referring to common law fraud, civil conspiracy to commit fraud, or breach of fiduciary duty the date on which they discovered their injuries. They did, however,

specifically allege that they "did not discover and should not have reasonably discovered that their damages were attributable to fraud . . . until sometime in mid-2002." (Compl. ¶ 175.) As explained earlier, it is reasonable for the court to infer that the time at which Plaintiffs ceased paying the Defendant entities—mid to late 2002—would approximately coincide with the time when when Plaintiffs discovered their injuries resulting either from Defendants' conduct or from the conduct of those individuals who were responsible on Plaintiffs' behalf for contracting and overseeing the work with the Defendant entities. As such, Plaintiffs' filing in 2005 was timely.

Defendants insist that Plaintiffs' claims are nevertheless time-barred because Plaintiffs have known since 1996 that Amir Rehmat was disloyal. (Rehmat Mot. at 23-24.) In fact, as alleged in the Complaint, GTI senior staff became aware that Amir Rehmat attempted to misappropriate its intellectual property as early as 1996. (Compl. ¶¶ 47-52.) Plaintiffs also allege that they resolved this dispute by forming Cement Lock Group LLC. (*Id.* ¶ 52.) For purposes of this motion, however, Plaintiffs' awareness of Amir Rehmat's disloyalty with respect to GTI's intellectual property rights is not sufficient to establish that Plaintiffs knew or should have known of the distinct fraudulent scheme alleged in the Complaint. (Compl. ¶¶ 47-52.)

## C.    Civil Conspiracy to Commit Fraud[32]

A claim for civil conspiracy to commit fraud requires—"(1) a combination of two or more persons; (2) for the purpose of accomplishing by some concerted action; (3) either an unlawful

---

[32]    Before proceeding with analysis of this claim, the court notes that both the Jones Defendants and the Rehmat Defendants argue that Count VI (Civil Conspiracy to Commit Fraud) should be dismissed as duplicative of Plaintiffs' other claims. (Jones Mot. at 25-26; Rehmat Mot. at 26-27.) Count VI does incorporate the factual allegations stated elsewhere in the Complaint and presents no new factual allegations, but because a claim for civil conspiracy has different legal requirements than all other claims in the Complaint, the court does not view Count VI as duplicative. The Barone Defendants similarly claim that Count VI must be dismissed as duplicative if it is not brought against additional defendants or if it does not involve new facts not pleaded in the underlying tort. (Barone Mot. at 14.) Assuming this argument has merit, the court notes that it does not require dismissal here, as the civil conspiracy claim is in fact brought against many more Defendants than the underlying tort of common law fraud.

purpose or a lawful purpose by unlawful means"—if the aim of the conspiracy is to commit fraud. *Smith v. Eli Lilly & Co.*, 137 Ill. 2d 222, 235, 560 N.E.2d 324, 329 (1990). Defendants challenge the sufficiency of Plaintiffs' civil conspiracy allegations, contending that Plaintiffs' pleading of their civil conspiracy claim should comport with Rule 9(b). (Barone Mot. at 15; Jones Mot. at 16-17.) The Barone Defendants cite to two cases, *Prince v. Campbell*, 314 F. Supp. 2d 793 (N.D. Ill. 2004), and *Edelman, Combs & Latturner v. Hinshaw & Culbertson*, 338 Ill. App. 3d 156, 788 N.E.2d 740 (1st Dist. 2003), neither of which are explicit that a claim of civil conspiracy must meet the requirements of Rule 9(b). Rather, these cases only state that vague and conclusory allegations of the existence of a conspiracy are insufficient. *See Prince*, 314 F. Supp. 2d at 793; *Edelman, Combs & Latturner*, 338 Ill. App. 3d at 168, 788 N.E.2d at 750. The Jones Defendants cite one unreported case, *see Dexia Credit Local v. Rogan*, No. 02-C-8288, 2003 WL 22349111, *9 (N.D. Ill. Oct. 14, 2003), which is not controlling. The Seventh Circuit has stated that conspiracy claims need not meet the heightened pleading rules of 9(b) but, because "a bare claim of conspiracy" is unenlightening, a claim of civil conspiracy does require allegations as to the parties, the purpose, and approximate date of the conspiracy. *See Loubser v. Thacker*, 440 F.3d 439, 442 (7th Cir. 2006).

Plaintiffs' allegations meet this standard. First, they have adequately identified the purpose of the conspiracy: Under the caption of "civil conspiracy to commit fraud," Plaintiffs allege that Defendants assisted the Core Group in their schemes to defraud Plaintiffs of millions of dollars. (Compl. ¶ 210.) The purpose of the conspiracy—to defraud Plaintiffs of money—can easily be inferred. Further, Plaintiffs allege elsewhere in the Complaint that, "since at least 1993," the Defendants agreed and conspired to violate RICO, with the object of the conspiracy being to participate in a pattern of racketeering activity to defraud Plaintiffs. (Compl. ¶¶ 178-79.) While this allegation falls under the caption for "racketeering conspiracy," it also confirms the purpose of the civil conspiracy and identifies the year in which it commenced. *See Loubser*, 440 F.3d at 443 (finding that plaintiff adequately alleged conspiracy in complaint though in "disjointed" form). It is

of no importance that Plaintiffs do not plead the dates that particular Defendants joined the conspiracy, as Plaintiffs cannot be expected to have this information at the time of filing. *See Loubser*, 440 F.3d at 443. Plaintiff also alleges that "Defendants," generally speaking, were all parties to the conspiracy and brings the conspiracy count against all Defendants. (Compl. ¶ 210.)

Even if greater particularity is required because the purpose of the alleged conspiracy is fraud, the Complaint's allegations are sufficient. Plaintiffs have supplemented their conspiracy claim with factual allegations as to the conduct of each Defendant, from which the court can infer each of the Defendants' agreement to and role in the conspiracy. *See Multiut Corp. v. Draiman*, 359 Ill. App. 3d 527, 538-39, 834 N.E.2d 43, 51 (1st Dist. 2005) (internal quotations and citations omitted) ("The conspiracy may be inferred if parties pursue the same object by common means, one performing one part and another performing another part.") In discussing the racketeering conspiracy above, the court provided examples of allegations describing individual Defendants' acts so as to enable an inference that each Defendant agreed to and furthered the conspiracy with the RICO enterprise. The same examples apply here. To take just one, Plaintiffs' allegation that Peter Barone, Lois Barone, and Susan Lee (and other individually identified Defendants) prepared or caused to be prepared certain false invoices and fraudulent subcontracts is certainly sufficient, for the purpose of this motion, to identify these Defendants as alleged conspirators because it establishes that each of them acted to further the conspiracy. (Compl. ¶¶ 64-66.)

In the context of a conspiracy claim, of course, all of the members of the conspiracy are liable for the unlawful acts "performed pursuant to and in furtherance of the conspiracy." *See Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54, 645 N.E.2d 888, 895 (1994). Thus, it is not necessary that each member of the conspiracy actually commit an act of fraud and Plaintiff here would not be required to plead as much, even under 9(b)'s heightened pleading rules. Plaintiffs' civil conspiracy claim survives as against all Defendants.

### C.      Breach of Fiduciary Duties

In Count III, Plaintiffs allege breaches of fiduciary duty and of loyalty on the part of Defendants Amir Rehmat, Tony Lee, and Peter Barone.[33]  To state a claim for breach of a fiduciary duty, a plaintiff must allege: "(1) a fiduciary duty on the part of the defendant, (2) a breach of that duty, (3) an injury, and (4) a proximate cause between the breach and the injury."  *See In re Estate of Lis*, 365 Ill. App. 3d 1, 8, 847 N.E.2d 879, 885 (1st Dist. 2006).  Each of the three Defendants moves to dismiss this claim.  Defendant Peter Barone argues that Plaintiffs have not identified any source of fiduciary duty on Barone's part and that the funds Plaintiffs claim to have lost as a result of Barone's breach did not belong to Plaintiff.  (Barone Mot. at 11-12.)  Defendant Amir Rehmat challenges Plaintiffs' allegation that Rehmat breached his duties to "Plaintiffs" generally; he urges that the Complaint does not allege that he was an employee of GRI and does not otherwise identify the nature of any duty he owed to GRI.  (Rehmat Mot. at 21.)  The Complaint does allege an employer/employee relationship between Rehmat and GTI, but Rehmat urges that allegation is insufficient to establish a fiduciary duty.  (Rehmat Mot. at 22.)  Defendant Tony Lee joins Rehmat's arguments.  (A. Lee Mot. at 1.)

Defendants' argument that an employment relationship is insufficient to create a fiduciary duty has no traction.  Under Illinois law, all employees, not just officers and directors, owe a duty of loyalty to their employer.  *Beltran v. Brentwood North Healthcare Center, LLC*, 426 F. Supp. 2d 827, 831-32 (N.D.Ill. 2006).  "'A fiduciary cannot act inconsistently with his agency or trust.'"  *See id.* at 831 (quoting *ABC Trans Nat'l Transp., Inc. v. Aeronautics Forwarders, Inc.*, 62 Ill. App. 3d 671, 379 N.E.2d 1228, 1237 (1978)).  The duty of loyalty prohibits an employee from action inconsistent with his employer's interest, including diversion of business opportunities or engaging in self-dealing or otherwise misappropriating the employer's property or funds.  *See Beltran*, 426

---

[33]      The court dismissed Count III against Serge Randhava above and ECH is no longer a Plaintiff to this count.

F. Supp. 2d at 831 (collecting cases).

*Gross v. University of Chicago*, 14 Ill. App. 3d 326, 339, 302 N.E.2d 444, 454 (1st Dist. 1973), an early case on which Defendants rely, does indicate that an employment relationship by itself is insufficient to support the existence of a fiduciary duty. (Barone Mot at 11; Rehmat Mot. at 22.) *Gross* states that some proof of "domination and influence" is necessary to establish a fiduciary relationship, *see Gross*, 14 Ill. App. 3d at 339, 302 N.E.2d at 454. More recent Illinois cases do not impose this same requirement, *see ABC Trans Nat'l Transp. Inc.*, 62 Ill. App. 3d at 683, 379 N.E.2d 1223 at 1237; in any event, Plaintiffs here have alleged that Amir Rehmat, Peter Barone, and Tony Lee used their positions as insiders at the Plaintiff organizations to gain approval of funding requests. (Compl. ¶ 53.) For purposes of this motion, this allegation is sufficient to support the conclusion that these Defendants were in a fiduciary relationship with their employers by virtue of their influence over such funds. Plaintiffs have adequately alleged a variety of breaches of Defendant's fiduciary duties, including theft of funds from Plaintiffs and self-dealing. (*Id.* ¶ 183.) *See Beltran*, 426 F. Supp. 2d at 831 (collecting cases). Plaintiffs also allege that Defendants' conduct caused them direct injury, which is sufficient to plead the proximate cause element. (Compl. ¶ 183.)

The court does agree with Defendants, however, that Plaintiffs' allegations are insufficient to establish a fiduciary duty toward any entity other than Defendants' employers. Accordingly, GRI's breach of fiduciary duty claim is dismissed without prejudice as against Amir Rehmat and Tony Lee, who are not alleged to have been employees of GRI. (*Id.* ¶¶ 18-19.) GRI may proceed on this claim only against Peter Barone, who is alleged to have been employed by GRI. (*Id.* ¶ 20.) And GTI's claim survives as against all three Defendants, as all three are alleged to have been employed by GTI at relevant times. (*Id.* ¶¶ 18-20.)

## CONCLUSION

For the reasons stated above, Defendants Peter Barone's and Barone Consulting Group, Inc.'s Motion to Dismiss (78) is granted in part and denied in part, Defendants Charles Wayne Jones, Kathreen L. Jones, Homatex, Inc. and Wayne and Associates' Motion to Dismiss the Complaint, or, in the Alternative for Summary Judgment (73-1,-2,-3) is granted in part and denied in part, Defendants Amirali G. Rehmat, Anar Rehmat, Zulfikar Rehmat, Jinnet Rehmat, ANE Research Inc., and Resource Recovery Consultants, Inc.'s Motion to Dismiss the Complaint or, in the Alternative, for Summary Judgment (64) is granted in part and denied in part, Defendants Surijit Randhava, Richard Kao, Unitel Technologies, and UT/GT's Motion to Dismiss (61) is granted, Defendants Susan Lee and Reaction Kinetics Consultants' Motion to Dismiss the Complaint (59) is granted in part and denied in part, Defendant Lloyd L. Lee's Motion to Dismiss or, in the Alternative, for Summary Judgment (68-1,-2) is granted in part and denied in part, Defendant Anthony Lee's Motion to Dismiss the Complaint (83) is granted in part and denied in part, Defendant Lois Barone's Motion to Dismiss (76) is granted in part and denied in part, and Defendant Shyam Singh's Motion to Dismiss the Complaint (80) is granted.

ENTER:

Dated:  December 15, 2006

_____

REBECCA R. PALLMEYER
United States District Judge