**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GAS TECHNOLOGY INSTITUTE,<br>GAS RESEARCH INSTITUTE, and GRI<br>INTERNATIONAL, INC., ENDESCO<br>SERVICES, INC., and ENDESCO CLEAN<br>HARBORS, LLC,<br><br>        Plaintiffs,<br><br>        v.<br><br>AMIRALI G. REHMAT, *et al.*,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br><br><br><br><br><br><br>No. 05 C 2712<br><br>Judge Rebecca R. Pallmeyer |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs in this action are five related entities involved in the development of certain environmental technologies, referred to here as "Cement-Lock," "ACIMET," and "GasTech" technologies. In short, Plaintiffs claim that their investments in these technologies were misappropriated and misused. In May 2005, Plaintiffs Gas Technology Institute ("GTI"), Gas Research Institute ("GRI"), and Endesco Clean Harbors LLC ("ECH") filed their initial seven-count complaint against dozens of Defendants. Over the course of the next several months, twenty-two Defendants filed motions to dismiss and motions for summary judgment. In December 2006, the court granted those motions in part and denied them in part. GTI, GRI, ECH filed an amended seven-count complaint in January 2007, now joined by GRI International, LLC ("GRI International") and Endesco Services, Inc. ("ESI").[1] Plaintiffs' claims against many of the Defendants have been settled or otherwise resolved. Four of the remaining Defendants–Unitel Technologies, Inc. ("Unitel"), UT/GT LLC ("UT/GT"), Surjit Randhava ("Serge"), and Richard Kao (together the "Unitel

---

[1] The court presumes that the Complaint's designation of two counts as "Count VI" was in error. As it did when resolving the motions to dismiss and motions for summary judgment in 2006, the court will refer to the civil conspiracy claim as Count VI and to the claim for equitable accounting as Count VII.

Defendants")—have moved to dismiss, or in the alternative for summary judgment on, the remaining counts against them. Those counts include: a racketeering conspiracy under 18 U.S.C. §§ 1962(d) and 1964 of the Racketeering Influenced and Corrupt Organizations Act ("RICO") against all Defendants (Count II); breach of fiduciary duties and the duty of loyalty against Defendant Serge (Count III); common law fraud against Defendants Serge and Kao, asserted only by Plaintiff GRI and GRI International (Count V); civil conspiracy to commit fraud against all Defendants (Count VI), and a claim for an equitable accounting against Serge and UT/GT, asserted only by Plaintiff GRI International (Count VII). For the reasons explained below, this Motion to Dismiss Amended Complaint or, in the Alternative, for Summary Judgment is granted in part and denied in part.

## BACKGROUND

The facts of this case were detailed in some depth in *Gas Technology Institute v. Rehmat*, 05 C 2712, 2006 WL 3743576 (N.D. Ill. Dec. 15, 2006) and thus will be repeated here only in brief. As relevant to the Unitel Defendants, the Plaintiffs in this action allege that they were injured by at least two different fraudulent schemes referred to as the "GasTech Fraud" and the "Cement-Lock Fraud." With regard to the GasTech Fraud, Plaintiffs allege that Serge fraudulently induced GRI and GRI International to provide $650,000 in funding for the GasTech venture, and that Defendants misappropriated approximately $300,000 of that funding. (Pls.' Resp. 3.) They claim that Kao prepared a report to make it appear that those funds had been properly spent on GasTech research and development. (*Id.*) Plaintiffs allege that the Cement-Lock Fraud involved a scheme by which various parties set up sham contractors who were supposed to perform work for Plaintiffs involving the Cement-Lock, ACIMET, and Gas Tech Technologies, but never did so. (Pls.' Resp. 8-10.)

## I.     The Parties

The individuals and entities involved in this action are heavily interrelated.  Plaintiff GTI is an Illinois not-for-profit corporation and the successor in interest to the Institute of Gas Technology. (Pls.' Resp. to Defs.' 56.1 ¶ 1.)  Plaintiff GRI is an Illinois not-for-profit corporation.  (*Id.* ¶ 2.) Plaintiff GRI International is a Delaware for-profit corporation and a wholly-owned subsidiary of GRI.  (*Id.* ¶ 3.)  Plaintiff ESI is an Illinois for-profit corporation and, according to Plaintiffs, a wholly-owned subsidiary of GTI.  (*Id.* ¶ 4.)  All of the managing employees of ESI are also employees of GTI.  (*Id.* ¶ 4.)  GRI International and ESI each own a 50% interest in Plaintiff ECH, which is a Delaware for-profit limited liability company.  (*Id.* ¶ 5.)

Defendant Unitel is an Illinois corporation owned by Serge and others.  (*Id.* ¶ 10.) Defendant UT/GT is a Delaware limited liability company.  (*Id.* ¶ 9.)  Serge is an Illinois resident who, at all relevant times, was a manager of Cement Lock Group LLC ("CLG") and the President of GasTech LLC ("GasTech").  (*Id.* ¶ 11.)  CLG is a Delaware limited liability company whose members are ESI, Cement Lock LLC ("CL"), and Richard Mell.  (*Id.* ¶ 6.)  GasTech is a Delaware limited liability company owned in equal parts by UT/GT and GRI International.  (*Id.* ¶ 7.)  Kao is an Illinois resident who was, at all relevant times, a manager of CLG and a member of CL.  (*Id.* ¶ 12.)  CL is an Illinois limited liability company whose members include Serge, Kao, Wayne & Associates, and Jinnet Hemani; CL is also a minority owner of CLG.  (*Id.* ¶ 8.)

## II.     The GasTech Fraud

GasTech LLC was formed as a Delaware limited liability company by an agreement between GRI International and UT/GT on November 3, 1999.  (Limited Liability Agreement of GasTech, L.L.C. ("GasTech LLC Agreement"), Defs.' Ex. D.)  GRI International and UT/GT are the only Members of GasTech.  (Pls.' Resp. to Defs.' 56.1 ¶ 15.)  Under the terms of the GasTech LLC Agreement, GRI made an initial capital contribution of $650,000 to GasTech, and UT/GT

contributed all of its right, title, and interest to intellectual property associated with "a new methane adsorption technology that can be used for increasing the output of an ammonia production facility, otherwise commonly known as 'debottlenecking.'" (GasTech LLC Agreement §§ 1.11, 4.1, Defs.' Ex. D.)  The parties refer to this methane adsorption technology as the A+ Process.  (Pls.' Resp. to Defs.' 56.1 ¶ 20.)  In exchange for these initial capital contributions, the GasTech LLC Agreement provides that GRI International and UT/GT would each receive 6,500 ownership units in the company.  (GasTech LLC Agreement §§ 1.20, 4.1, Defs.' Ex. D.)[2]  Contemporaneous with the GasTech LLC Agreement, GasTech entered into an Investor Rights Agreement with GRI International, by which GRI International purchased a 50% membership interest in GasTech for $650,000.  (Pls.' Resp. to Defs.' 56.1 ¶ 19.)  It is not clear why this separate agreement was necessary, but it does impose limitations on the GasTech funding.  Specifically, the Investor Rights Agreement dictates that the $650,000 is "subject to certain use limitations" including that "the funds invested by GRI in GASTECH . . . shall be used for research, development and demonstration of GasTech's A+ proprietary technology for methane adsorption in ammonia production plants." (Defs.' Resp. to Pls.' 56.1 ¶ 22.)  Serge signed the Investor Rights Agreement on behalf of GasTech.  (*Id.*)  In connection with the formation of GasTech, UT/GT contributed its intellectual property relating to the methane adsorption technology.  (Pls.' Resp. to Defs.' 56.1 ¶ 20.)

On November 19, 1999, $650,000 was transferred from a bank account owned by GRI to

---

[2]     Plaintiffs seek to rely on external documents to construe this contract, including an August 27, 1999 Memorandum of Understanding between GRI International and Unitel (*not* UT/GT) related to licencing of methane adsoprtion technology.  (*See* Pls.' Resp. to Defs.' 56.1 ¶ 16-18.)  Plaintiffs suggest that this Memorandum of Understanding demonstrates that GRI International's financial contribution was not capitalization.  But this argument necessarily fails.  The language of an unambiguous contract "speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence."  *Air Safety v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462, 706 N.E.2d 882, 884 (1999), (quoting *Western Illinois Oil Co. v. Thompson*, 26 Ill. 2d 287, 291, 186 N.E.2d 285 (1962)).  Thus, absent a finding that the GasTech LLC Agreement was ambiguous, the court need not consider the Memorandum of Understanding, to which UT/GT itself was not a party.

a bank account owned by Unitel.  (Pls.' Resp. to Defs.' 56.1 ¶ 27.)  S. Peter Barone and Paul Chromek, both of whom were GRI employees, approved the wire transfer.  (*Id*. ¶¶ 22, 27.)  The particular allegations against the Unitel Defendants related to this GasTech Fraud will be discussed in greater detail below, but essentially, Plaintiffs GRI and GRI International claim that they were defrauded into making this wire transfer and that the funding was ultimately misappropriated.  It is undisputed that a significant portion of this $650,000 was indeed misappropriated and that that sum was eventually distributed to Barone, Lee, and a third party named Shyam Singh, whose relationship to the Core Group has not been explained in the record before the court, all in the form of kickbacks.  (*Id*. ¶ 31; Defs.' Resp. to Pls.' 56.1 ¶¶ 34.)  Plaintiffs claim that, as a part of this scheme, Serge fraudulently induced GRI and GRI International to provide the $650,000 in funding, and that he ultimately misappropriated the funding, including $100,000 to himself.  (Pls.' Resp. 3.)  They allege that Kao participated in attempts to cover up the GasTech Fraud, once it had occurred.  (*Id*.)  As a consequence of the GasTech Fraud, GRI and GRI International claim to have lost more than $530,000 of the $650,000 contributed to GasTech.  (Verified Am. Compl. [Docket Entry No. 183] ¶ 173.)

## III.    The Cement-Lock Fraud

Plaintiffs also claim that Defendants are implicated in a fraud related to the Cement-Lock Technology.  Plaintiffs have identified the "Core Group" of perpetrators of this (and other) schemes to defraud and steal millions of dollars from Plaintiffs: S. Peter Barone, Amirali Rehmat, and Anthony Lee.  (Verified Am. Compl. ¶¶ 25-28.)  The parties do not explain the mechanics of this fraud in great depth here.  Rehmat, Lee, Serge, Kao, Wayne and Associates, Hemani, and others formed CL in 1996.  (*Id*. ¶ 57.)  Plaintiffs allege that Kathreen Jones and her husband Charles Wayne Jones, Lee's daughter and son-in-law, respectively, set up sham entities called Homatex and Wayne and Associates.  (*Id*. ¶ 90.)  They assert that Lee directed that these entities be set up,

that Lee at all times controlled the funds deposited into and withdrawn from these sham entities'
accounts (*id.*), and that Wayne and Associates, in fact, held an ownership interest in CL on behalf
of Lee. (Pls.' 56.1 ¶ 1.) Plaintiffs further assert that Hemani was Rehmat's sister-in-law and the
mere alter ego of Rehmat. (Verified Am. Compl. ¶¶ 30, 187.) In 1996 and 1997, Rehmat, Lee,
Serge, Kao, and others filed patent applications in the United States and abroad, for processes to
which Plaintiffs claim they had no proprietary rights. (*Id.* ¶¶ 57-59.) A dispute regarding patent
rights arose, and Plaintiffs assert that CLG was formed in 1997 to attempt to resolve it. (*Id.* ¶ 60.)
CL became a minority owner of CLG. (Pls.' Resp. to Defs.' 56.1 ¶ 8.) According to Plaintiffs,
Rehmat and Lee had a financial and ownership interest in CL (and thus CLG), which they
concealed from their employers: GTI and GRI. (*Id.* ¶ 61.) Those interests would have created a
conflict of interest; if disclosed, Plaintiffs allege, the conflict would have led to Rehmat's and Lee's
termination. (*Id.*)

And in fact, it is agreed by all parties to this action that Rehmat and Lee, with Barone, did
perpetrate a fraud related to the Cement-Lock Technology. Plaintiffs allege that the CLG (a limited
liability company of which CL is a member) licensed the Cement-Lock Technology to ECH.
(Verified Am. Compl. ¶ 65.) Barone, Rehmat, and Lee prepared and executed subcontracts with
various outside entities, some of which actually did develop the Cement-Lock Technology, and
others of which merely purported to. (*Id.* ¶ 69.) Plaintiffs allege that at least ten of these outside
contractors were shams. (*Id.*) As a consequence of this scheme, Plaintiffs claim to have lost over
$4.3 million. (*Id.* ¶ 104.) Plaintiffs assert that Serge willfully concealed and did not disclose
Rehmat's and Lee's interest in CL, and thereby in CLG, which makes him an active participant in
their fraud. (*Id.* ¶ 63.)

Defendants Unitel, UT/GT, Serge, and Kao (together, the "Unitel Defendants") now move
the court to dismiss or grant summary judgment in their favor on all of the claims brought against
them: Counts II (racketeering conspiracy), III (breach of fiduciary duty), V (common law fraud), VI

(civil conspiracy to commit fraud), and VII (accounting).

**DISCUSSION**

## I.     Jurisdiction

The court has federal question jurisdiction over this civil action because there are causes of action arising under section 1964 of RICO.  28 U.S.C. § 1331 (2000).  The court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## II.     Legal Standard

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  Summary judgment is not appropriate if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  As the moving parties, the Defendants bear the initial burden of proving that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law.  *Hicks v. Midwest Transit, Inc.*, 500 F.3d 647, 651 (7th Cir. 2007).  The Plaintiffs retain the burden of producing evidence sufficient to support a reasonable jury verdict in their favor.  *Id.*

## III.     Claims Relating to GasTech

### A.     Standing

The Unitel Defendants challenge Plaintiffs' standing, arguing that only GasTech has standing to bring claims related to the GasTech Fraud.  (Defs.' Mem. 6.)  They concede that, as a Member of GasTech, GRI International might have derivative standing to bring this lawsuit on GasTech's behalf but point out that GRI International has not met the pleading requirements necessary to bring a derivative claim.  (Defs.' Mem. 6-7.)  As a threshold matter, then, the court

7

must determine whether Plaintiffs GRI and GRI International bring their claims related to the GasTech fraud based on direct or derivative standing. A member of a limited liability company may "bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce." Fᴇᴅ. R. Cɪᴠ. P. 23.1(a). The question here is whether the right being asserted properly belongs to GasTech or to any of the Plaintiffs in this action. Because the court has federal question jurisdiction, federal law governs the issue or whether the action is derivative or direct. 7C Cʜᴀʀʟᴇs Aʟᴀɴ Wʀɪɢʜᴛ ᴇᴛ ᴀʟ., Fᴇᴅᴇʀᴀʟ Pʀᴀᴄᴛɪᴄᴇ ᴀɴᴅ Pʀᴏᴄᴇᴅᴜʀᴇ § 1821 (3d ed. 2007).

The rights of a member to pursue a derivative action on behalf of a limited liability company may not be precisely analogous to the rights of a shareholder to pursue a derivative action on behalf of a corporation. Limited liability companies in fact have features common to partnerships. In a case cited by neither party, the Seventh Circuit has made clear that partners may elect to bring fraud and breach of fiduciary duty claims on their own behalf, rather than to bring, for example, a representative RICO claim on behalf of the partnership. *See Lefkovitz v. Wagner*, 395 F.3d 773, 776-77 (7th Cir. 2005). Other courts have recognized that there may be a more flexible test for determining whether a lawsuit brought to enforce the interests of a partnership rather than a corporation is considered derivative:

> [A]pplication of corporate law rules to disputes related to a limited partnership necessitates a bit of flexibility. In the partnership context, the relationships among the parties may be so simple and the circumstances so clear-cut that the distinction between direct and derivative claims becomes irrelevant. Similarly, in some instances, the relationships among the parties and the function and structure of the partnership itself may diverge from the corporate model so dramatically that some claims, which in a corporate context might be classified as derivative, must be brought as direct, claims in order to enable the injured parties to recover while preventing a windfall to individuals or entities whose interests were not injured.

*Blystra v. Fiber Tech Group, Inc.*, 407 F. Supp. 2d 636, 646 (D.N.J. 2005) (internal punctuation marks omitted) (quoting *Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, 829 A.2d 143, 150-51 (Del. Ch. 2003) (quoting *In re Cencom Cable Income Partners L.P. Litig.*, No. 14634, 2000

WL 130629, at *3 (Del. Ch. Jan. 27, 2000))). Thus, although a derivative lawsuit may be brought on behalf of a partnership, *see Lefkovitz*, 395 F.3d at 776, *Blystra* suggests that the derivative model may not always be appropriate to resolve partnership claims. Instead, the more different an entity is from a corporation, the more flexible courts should be in applying rules regarding derivative actions. *Blystra*, 407 F. Supp. 2d at 646. In this case, as in *Blystra*, there are tight restrictions placed on transferability of the members' ownership interests in the company (*see* GasTech LLC Agreement § 9.1, Defs.' Ex. D), which differentiates the company from a corporation. *Blystra*, 407 F. Supp. 2d at 646. This may reflect that the identity of the members of a limited liability company is more significant than the identity of a corporations' shareholders. Indeed, in the context of determining whether diversity jurisdiction exists, the Seventh Circuit has recognized that the identity of the members of a limited liability company is significant in a way that the identity of a corporations' shareholders is not. *See, e.g., Wise v. Wachovia Sec., LLC*, 450 F.3d 265, 267 (7th Cir. 2006). A limited liability company is thus treated like a partnership rather than a corporation: its citizenship is that of each of its members rather than the state under whose laws it is organized. *Id.* That one of GasTech's two members (UT/GT) and President (Serge) are Defendants in this action underscores that the derivative model is inappropriate.

Moreover, Plaintiffs do not merely claim that GasTech's resources were misspent but, more specifically, that GRI was defrauded into paying $650,000 on behalf of GRI International, which was then misappropriated. (Pls.' Resp. 3.) Thus, GRI International, as the party who contractually agreed to contribute $650,000 to GasTech, and GRI, as its parent company and the entity that advanced the funds, suffered an injury distinct from any injury suffered by the limited liability company itself. GRI and GRI International therefore have standing to bring this direct action for fraud (Count V against Serge and Kao) and breach of fiduciary duty (Count III against Serge). *Cf. Lefkovitz*, 395 F.3d at 776.

Plaintiffs have failed, however, to properly plead these claims as a derivative cause of

action.  Rule 23.1(b)(3) requires that a derivative plaintiff state with particularity the efforts to obtain the action plaintiff desires from the entity in question and the failure to obtain that desired action, or the reason for not making the effort. Here, Plaintiffs apparently acknowledge that they have not met this pleading requirement.  Indeed, they argue for the futility of the demand requirement in summary judgment briefing despite having failed to do so in the Amended Complaint.  The only excuse they offer for this failure is that the demand would serve no purpose.  (Pls.' Resp. 5-6.)  As justification, they cite to *Cencom Cable*, 2000 WL 130629.  But *In re Cencom* involves a decision permitting partners to proceed with a direct class action claim related to liquidation of the partnership.  *Cencom Cable*, 2000 WL 130629, at *6 ("I find the claims for breach of fiduciary duty and breach of the partnership agreement are, in substance, direct claims . . . .).  Accordingly, it does not speak to the demand requirement of Rule 23.1.  In the absence of any authority for waiving the demand requirement in this case, the court holds that GRI and GRI International may only maintain claims related to the GasTech Project insofar as they can maintain them as direct claims.

### B.    Agreement to Arbitrate

The GasTech LLC Agreement contains an arbitration clause, requiring arbitration of all controversies arising under or related to the GasTech LLC Agreement.  (GasTech Agreement § 12.12, Defs.' Ex. D.)  But since this lawsuit was first filed against the Unitel Defendants in May 2005, the Unitel Defendants have never invoked the GasTech LLC Agreement's arbitration clause. Instead, they filed a motion to dismiss in August 2005 (Docket Entry No. 61), as well as various discovery motions.  (Docket Entries No. 150, 161, 175.)  After the Amended Complaint was filed, the Unitel Defendants filed an additional discovery motion.  (Docket Entry No. 186.)  For the first time in this motion–nearly two years after the original complaint was filed, the Unitel Defendants have raised the arbitration clause.  To date, they have never moved to compel arbitration.

Having participated in the litigation before this court, Defendants have presumptively waived the agreement to arbitrate. *See Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 390 (7th Cir. 1995) ("an election to proceed before a nonarbitral tribunal for the resolution of a contractual dispute is a presumptive waiver of the right to arbitrate")*; Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 926 (3d Cir. 1992) ("Although waiver is not favored . . . courts have not hesitated to hold that the right to arbitrate has been waived under circumstances similar to those here."). The "prejudice to the other party, the party resisting arbitration, should weigh heavily in the decision to send the case to arbitration, as should the diligence or lack thereof of the party seeking arbitration–did that party do all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration?" *Cabinetree*, 50 F.3d at 391.

Here, the Unitel Defendants contend that they could not have sought to arbitrate in 2005 because none of the original Plaintiffs were parties to the arbitration agreement. (Defs.' Reply 7.) It is true that GRI International, who became a Plaintiff in January 2007, is the only Plaintiff who is a party to the GasTech LLC Agreement. Thus, significantly, only GRI International's dispute could be send to arbitration, which would force resolution of the Plaintiffs' claims in two different fora. The court concludes that directing the parties to proceed to arbitration at this stage would be prejudicial to Plaintiffs, who have conducted extensive discovery in this court and object to any change of forum at this late stage in the litigation. With regard to Unitel Defendants' diligence, they do not deny that they have at all times been aware of the GasTech LLC Agreement and of the existence of GRI International, a party to that Agreement (and wholly-owned subsidiary of GRI, which was an original Plaintiff in this action). Even since GRI International became a Plaintiff, Defendants have continued to conduct discovery, file discovery motions, (*see* Docket Entry No. 186), file motions *in limine*, (Docket Entry Nos. 273-280), and otherwise prepare for trial in this court. In all this time, they never filed a motion to compel arbitration. Thus, Defendants did not

invoke the arbitration provision at their earliest opportunity and have waived their rights to invoke the arbitration clause.

**C.      Statute of Limitations**

The Unitel Defendants next argue that the Delaware state of limitations bars Plaintiffs' fraud, conspiracy, breach of fiduciary duty, and RICO conspiracy claims. (Defs.' Mem. 9-10.) But "Illinois applies forum law to procedural matters, which include statutes of limitations. . . . This is true even where the litigants are parties to a contract containing a choice of law provision." *Telular Corp. v. Mentor Graphics Corp.*, 282 F. Supp. 2d 869, 871 (N.D. Ill. 2003) (internal citations omitted). And as the court has previous noted, "[i]n Illinois, the statute of limitation begins to run when the plaintiff knows or reasonably should have known of the injury that was wrongfully caused." *Gas Tech. Inst. v. Rehmat*, No. 05 C 2712, 2006 WL 3743576, at *34 (N.D. Ill. Dec. 15, 2006) (citing *Knox Coll. v. Celotex Corp.*, 88 Ill.2d 407, 415-16, 430 N.E.2d 976 (1981)). The court further held that, applying the discovery rule, it is reasonable to conclude that the fraud was not uncovered, nor could it reasonably have been uncovered, until late 2002, and thus that Plaintiffs' filing of its state law claims in 2005 was timely. *Id.* The Unitel Defendants offer no basis on which the court should revisit that ruling, and the court will not do so. *See Moriarty v. Svec*, 429 F. 3d 710, 722 (7th Cir. 2005) ("Law of the case doctrine advises against a court reopening previously decided issues."). Plaintiffs have likewise met the four-year statute of limitations governing RICO conspiracy claim. *Agency Holding Corp. V. Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987). Plaintiffs' motion to dismiss based on the statute of limitations is therefore denied.

**D.      Claims Against Serge**

Having determined that there is no legal ground on which to dismiss Plaintiffs' claims related to the GasTech Fraud, the court turns to the facts relevant to Unitel Defendants' claims for summary judgment. First, Plaintiffs contend that Serge is entitled to summary judgment on Count

III (breach of fiduciary duty) and Count V (fraud) because he was not aware of the fraudulent activity relating to the GasTech Project. (Pls.' Mem. 11-12.)

### 1. Breach of Fiduciary Duty

As discussed above, GRI and GRI International have standing, under the more flexible standard properly applied to limited liability companies, to bring breach of fiduciary duty and fraud claims to redress wrongs perpetrated against them. (*See* Section III.A.) Plaintiffs may not, however, bring a breach of fiduciary duty claim to redress wrongs perpetrated against GasTech. (*Id.*) Plaintiffs make clear that their breach of fiduciary claim "is limited to his [Serge's] mismanagement and self-dealing as GasTech LLC." (Pls.' Resp. 19.) As a result, Count III must be dismissed for lack of standing. *Lefkovitz*, 395 F.3d at 776 ("if individual partners sue to enforce rights belonging to a nonconsenting third party, namely the partnership, the court must dismiss the suit.").

### 2. Fraud

"The elements of common law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496, 675 N.E.2d 584, 591 (1996). In addition, reliance upon the truth of the statement must be justifiable. *Teamsters Local 282 Pension Trust Fund v. Angelos*, 839 F.2d 366, 370 (7th Cir. 1988). Because Plaintiffs have provided evidence from which a reasonable jury could conclude that Serge committed a fraud in connection with the GasTech venture, he is not entitled to summary judgment on Count V.

Serge played a central role in obtaining and distributing funding related to the GasTech venture. As explained above, GasTech was formed in November 1999. In the fall of that year,

Unitel submitted a proposal to GRI to obtain funding for research and other work related to the A+ Process. (Pls.' Resp. to Defs.' 56.1 ¶ 21.) Some time after Unitel submitted that proposal, Serge called GTI's Anthony Lee and asked Lee to "put in a good word" with S. Peter Barone, the GRI employee who decided whether to fund research projects. (*Id.* ¶ 22.) Lee did in fact speak with Barone about the project. (*Id.* ¶ 23.) The parties appear to agree that Barone and Lee discussed the possibility of connecting the GasTech project with an unrelated project and issuing the funding in one lump sum, rather than separately, although they dispute whether the idea was Lee's or Barone's. (*Id.*) Lee then spoke with Serge about the proposal of combining two projects. (*Id.* ¶ 24.) Serge was told that he should pay invoices he received from Shyam Singh's companies (described below) upon receipt, though the parties dispute who so instructed him. (*Id.* ¶ 25.)

On November 19, 1999, $650,000 was transferred from a bank account owned by GRI to a bank account owned by Unitel. (Pls.' Resp. to Defs.' 56.1 ¶ 27.) In January 2000, Serge received invoices from three companies located in Rockford, Illinois: SS Energy Environmental International; Thermoplastec; and Energy Environmental Solutions, Inc., each of which referenced "GasTech." (*Id.* ¶ 28.) Singh owns SS Energy Environmental International, Thermoplastec, and Energy Environmental Solutions, Inc. (together, the "Singh Companies"). (*Id.* ¶ 29.) There is some dispute as to whether Serge was told or authorized by Paul Chromek to pay the invoices, but it is undisputed that Serge did issue checks to the Singh Companies, which were drawn from GasTech's $650,000 payment from GRI. (*Id.* ¶ 28; Defs.' Resp. to Pls.' 56.1 ¶¶ 29, 30.) In total, Serge paid the Singh Companies $325,000; each of the three checks he issued was marked with the word "GasTech" and an invoice number on the memo line. (Defs.' Resp. to Pls.' 56.1 ¶ 30.) All the checks were drawn upon the Unitel account into which the $650,000 payment had been deposited. (*Id.*) Serge himself never met or spoke with Singh. (Pls.' Resp. to Defs.' 56.1 ¶ 30.) He did not know who Singh or Singh's companies were and had not communicated with them.

14

(Defs.' Resp. to Pls.' 56.1 ¶ 28.) Serge testified that this raised no "red flags" for him. (*Id.*) In fact, however, Singh Companies did no work for GasTech, and it is undisputed that Serge knew this. (*Id.*) Ultimately, the money Unitel paid to the Singh Companies was not used for any legitimate purpose. Of the $325,000 paid to the Singh Companies, it is undisputed that the Singh Companies kept $25,000 and passed the rest to Barone. (*Id.* ¶ 34.) Barone paid Lee $100,000 of the money he received from the Singh Companies. (*Id.*)

Serge also issued other checks of significance to this action. On January 31, 2000, a Unitel check, signed by Serge, was issued to Wayne and Associates. (Defs.' Resp. to Pls.' 56.1 ¶ 31.) Plaintiffs contend that Lee directed Serge to retain Wayne and Associates to market GasTech's technology, and that Serge did so, despite language in the Investor Rights Agreement that prohibited any use of GRI's funds for "marketing or sales efforts"–language which Serge admittedly knew. (Pls.' 56.1 ¶¶ 24-25.) There is no dispute that GasTech never received any work product from Wayne and Associates, though Plaintiffs have characterized the $20,000 check as a retainer. (Defs.' Resp. to Pls.' 56.1 ¶ 26.) Lee testified that he left this check with his daughter, Kathreen Jones. (*Id.*)[3] She appears to have had no legitimate business relationship with GasTech.

Beyond this $345,000 in payments that Unitel issued on January 31, 2000 from the GasTech funds, all under Serge's signature, Serge also signed checks to himself. Specifically, between November 23, 1999 and December 29, 1999, Serge signed three checks payable to himself, which totaled $110,000 and issued from Unitel's account 102365. (Defs.' Resp. to Pls.' 56.1 ¶ 33.) The $650,000 paid to GasTech pursuant to the GasTech LLC Agreement was also wired into Unitel account number 102365. (*Id.* ¶ 23.) Serge disputes that the checks he signed to himself were drawn from the GasTech funds but has never explained the basis on which he

---

[3]     A Unitel check for $10,000, signed by Serge, was issued to Kao on January 31, 2000; over more than two years, Kao was issued checks, signed by Serge, totaling some $96,000. (Defs.' Resp. to Pls.' 56.1 ¶ 32.) The parties do not, however, make clear whether this check was drawn on the $650,000 investment from GRI International.

disputes this, nor identified what other funds were available to fund these payments. (*Id.*)

Serge claims that summary judgment is appropriate on Plaintiffs' fraud claims because he himself was not aware that the Singh Companies were doing no work nor that Singh was funneling the $325,000 he received, in large part, to Barone and Lee. (Defs.' Mem. 11-12.) Notably, however, there is no dispute that the Singh Company invoices "were fraudulent and part of a kickback scheme." (Pls.' Resp. to Defs.' 56.1 ¶ 31.) The only dispute for purposes of this action is whether Serge was a part of that kickback scheme, or whether it was limited to Singh, Barone, and Lee.

Plaintiffs rely on certain Singh and Barone testimony to rebut Serge's assertions that he was not involved. Defendants have moved to strike that testimony. Because the court determines that Serge is not entitled to summary judgment without resort to the disputed testimony, the court will not consider Defendants' motion to strike at this stage. Instead, Serge's actions themselves create a genuine issue of material fact as to his awareness of the kickback scheme. On November 19, 1999, $650,000 was transferred into the bank account owned by Unitel. (Pls.' Resp. to Defs.' 56.1 ¶ 27.) Over the course of the next six weeks, Serge issued $110,000 in checks to himself from that bank account. (Defs.' Resp. to Pls.' 56.1 ¶ 33.) Within two and a half months, Serge had signed checks issuing $325,000 to companies he had never heard of, for invoices marked "Gas Tek, LLC," knowing that the companies did no work on the GasTech project. (*Id.* ¶¶ 27-30.) At the same time, he paid $20,000 to another subcontractor who did no work on the GasTech project. (*Id.* ¶¶ 24-26, 31.) This is ample circumstantial evidence that Serge participated in a fraud.

### E.    Claims Against Kao

Kao moves for summary judgment on Count V, for fraud, on the ground that he did not defraud GRI or GRI International by his silence, and that he committed no affirmative fraud. Plaintiffs and Kao seem to agree that the only fraud allegation against him is that "he prepared one

16

or more phony technical reports that resembled the legitimate work product required under the certain subcontracts." (Verified Am. Compl. ¶ 195.) The only such report in the record related to the A+ process and was submitted by GasTech to GRI on or about May 30, 2002. (Pls.' Resp. to Defs.' 56.1 ¶ 37; Proposal, Ex. O to Defs.' 56.1.) Defendants point out that submission of the report was not required by the terms of the GasTech LLC Agreement or the Investor Rights Agreement, but Plaintiffs insist such a report was "implicitly" required. (Pls.' Resp. to Defs.' 56.1 ¶ 36.) According to Plaintiffs, the report Kao did prepare was intended to "conceal the true nature of GasTech's 'research and development' costs–costs that included over $325,000 in kick-backs to Peter Barone and Tony Lee and $110,000 in payments to Surjit Randhava." (Pls.' Resp. 20.) In addition, because Adsorption Research was paid $90,495 for the research (Pls.' 56.1 ¶ 35), Plaintiffs contend the report was misleading in that it did not explicitly disclose this cost. (Pls.' Resp. 20.) In fact, the May 2002 Report says nothing about the cost of preparation: Plaintiffs dispute this, (Pls.' Resp. to Defs.' 56.1 ¶ 37), but provide no evidence that Kao affirmatively misrepresented the cost of preparation, so the court concludes that Kao's silence on this issue is undisputed. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 689 (7th Cir. 2000) ("An answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission.").

Plaintiffs assert that Kao's conduct constitutes a fraudulent concealment, citing *Heider v. Leewards Creative Crafts, Inc.*, 245 Ill. App. 3d 258, 270, 613 N.E.2d 805, 814 (2d Dist. 1993). Such a claim requires, however, a showing of "circumstances creating a duty to speak" on Kao's part. *Trs. of the AFTRA Health Fund v. Biondi*, 303 F.3d 765, 777 (7th Cir. 2002). Circumstances creating a duty to speak include "the existence of a special or fiduciary relationship . . . ." *Neptuno Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*, 295 Ill. App. 3d 567, 573, 692 N.E.2d 812, 817 (1st Dist. 1998). "[T]here is no duty to speak absent a fiduciary or other legal relationship between the parties. The burden of proving that a fiduciary relationship exists lies with the party

17

seeking relief." *Id.* (internal citation omitted). The court concludes that Kao's failure to disclose a cost term alone does not constitute fraud, under Illinois law. *Neptuno*, 295 Ill. App. 3d at 573, 692 N.E.2d at 817. Plaintiffs allege that Kao owed a fiduciary duty to CLG and its majority owner, ESI. (Verified Am. Compl. ¶ 42.) But neither CLG nor ESI has brought a fraud claim against Kao. GRI and GRI International have asserted a common law fraud claim against Kao, but there is no allegation that Kao owed a special duty to GRI or GRI International. There is no evidence, for example, that he was a manager, director, or officer of either entity.

Nevertheless, Plaintiffs contend that the report was Kao submitted "plagiarized and lifted" from work performed by Adsorption Research, which Sarabjit Randhava claimed was a disaster. (Pls.' Resp. 21.) Kao claims to have reviewed the work, uncovered an error in the experiments, corrected the work, verified the mass balances, and drafted several drawings in the report. (Defs.' Resp. to Pls.' 56.1 ¶ 36.) Plaintiffs allege that Kao cobbled together this report "to support the pretense that Defendants used GRI's $650,000 for Gas Tech-related work." (*Id.*) Plaintiffs offer no support for this bare assertion, however, nor any evidence that the results of Kao's report were somehow fraudulent. The fact that the report was, in Plaintiffs' view, incomplete, is not enough to sustain a fraud claim against Kao, who is not alleged to owe Plaintiffs a fiduciary duty. Accordingly, Kao is entitled to summary judgment on Count V.

### F.    Equitable Accounting

"An accounting is 'an adjustment of the accounts of the parties and a rendering of judgment for the balance ascertained to be due.'" *Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, No. 02 C 3293, 2004 U.S. Dist. LEXIS 17876 at *13 (N.D. Ill. Sept. 3, 2004) (quoting 1 AM. JUR. 2d *Accounts and Accounting* § 52 (2004)). Accounting is an equitable remedy, properly imposed where any legal remedy would be inadequate, and there is: "(1) breach of a fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts

which are of a complex nature." *ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 545 (7th Cir. 2003) (citation omitted). In this case, Plaintiffs claim that they are entitled to an equitable accounting for two reasons: first, they received, from a third party, some documents regarding the wrongdoing in this case that should have been produced by Serge, and, second, documents to which they are entitled in the companion case to this one, Case No. 05 C 0018, have not yet been produced. (Pls.' Resp. 21.) The court infers that Plaintiffs believe these difficulties with discovery demonstrate that the legal remedy for Defendants' wrongdoing would be inadequate. These two alleged shortcomings in the production, however, are not sufficient to merit imposing an equitable accounting in this case. With respect to the documents that Plaintiffs received from a third party, there is no dispute that they *did* ultimately receive those documents and no claim that other documents remain unproduced. And with respect to the documents to which Plaintiffs claim entitlement in Case No. 05 C 0018, the court is unwilling to impose a remedy in this action for that purported deficiency, particularly given that none of the Unitel Defendants is a party to that action. Accordingly, Serge and UT/GT are entitled to summary judgment on Count VII.

## II.     Claims Relating to Cement-Lock Fraud

### A.     Pleading Requirements for Counts II and VI (conspiracy)

The parties dispute the pleading standard applicable to RICO and civil conspiracy claims, but neither points to the Seventh Circuit case, decided during this briefing, that decides the point. The Seventh Circuit has made clear that the heightened pleading standard of Rule 9(b) does apply to conspiracy claims that sound in tort. *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507-508 (7th Cir. 2007). Rule 9(b) requires that parties plead with particularity "averments of fraud." *See* Fed. R. Civ. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.").

19

> Although claims of . . . civil conspiracy are not by definition fraudulent torts, Rule 9(b) applies to 'averments of fraud,' not claims of fraud, so whether the rule applies will depend on the plaintiffs' factual allegations. A claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements.

*Borsellino*, 477 F.3d at 507-508 (internal citations omitted). The Seventh Circuit has not expressly extended this heightened pleading requirement to RICO claims. *See Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 733 n.10 (7th Cir. 1998) ("This court has yet to decide the extent to which Rule 9(b)'s particularity requirement applies to allegations under RICO's conspiracy provision."). Nevertheless, the court concludes that *Borsellino* requires that parties plead their RICO conspiracy claims with particularity.

To meet this requirement, Plaintiffs must allege that each Unitel Defendant agreed to participate in the conspiracy. First, with regard to RICO conspiracy, the "touchstone of liability" is "an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." *Goren*, 156 F.3d at 732. Thus, Plaintiffs "must allege (1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Id.* Plaintiffs must allege that the Unitel Defendants agreed to participate in the RICO conspiracy, though they need not allege that Defendants agreed to participate as operators or managers. *Id.* at 732 n.9; *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000) ("One must knowingly agree to perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner. It is an agreement, not to operate or manage the enterprise, but personally to facilitate the activities of those who do."). Similarly, in the context of a civil conspiracy under Illinois law, a plaintiff must prove: "(1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the coconspirators in furtherance of the agreement that

20

caused an injury to the plaintiff." *Borsellino*, 477 F.3d at 509. Thus, where "the complaint tells us nothing about the nature of the purported agreement to defraud the plaintiffs, such as when it was made or which individuals . . . arranged the conspiracy," a civil conspiracy claim must be dismissed. *Id.* Instead, Plaintiffs must plead the "critical details regarding the alleged fraud conspiracy as it relates to" the Unitel Defendants. *Id.*

Here, Plaintiffs have not specifically alleged that each Unitel Defendant agreed to participate in the conspiracy. (*See* Verified Am. Compl. ¶¶ 210, 242.) This is understandable, given the court's prior ruling that Plaintiffs were not required to plead conspiracy claims with particularity. *Gas Tech. Inst.*, 2006 WL 3743576, at *33. As the Seventh Circuit has now expressly addressed the issue, the court will direct Plaintiff to amend their complaint to comply with the heightened pleading standards of Rule 9(b). *See* FED. R. CIV. P. 15(a) (leave to amend "shall be freely given when justice so requires"); *Cannon v. Washington*, 418 F.3d 714, 720 (7th Cir. 2005) ("A district court should freely grant a plaintiff leave to amend . . . "). In addition, Plaintiffs apparently concede that the Verified Amended Complaint points to no statements or omissions attributed to Unitel or UT/GT relating to the Cement-Lock Fraud, as they never identify any such statements or omissions. (Pls.' Mem. 8-13.) Accordingly, they are directed to identify any such statements or omissions, or withdraw that claim as against Unitel and UT/GI.

The details of the Cement-Lock Fraud are set out in paragraphs 65 through 104 of the Verified Amended Complaint. Although, curiously, Plaintiffs fail to cite a single one of those allegations in their brief, (Pls.' Mem. 8-13), the court concludes they have adequately pleaded the participation of Serge and Kao in the conspiracy they describe. For example, they allege that in 1996 and 1997, Serge was one of several individuals to attempt to patent the Cement-Lock Technology, to which he had no proprietary rights (Verified Am. Compl. ¶¶ 57-59), and that CLG was formed to attempt to resolve this dispute regarding patent rights. (*Id.* ¶ 60.) They allege that Serge participated in concealing the fraud, or orchestrated by the Core Group (Barone, Lu, and

21

Rehmat) by concealing from Plaintiffs that several subcontractors involved in the scheme were mere alter egos of members of the Core Group. (*Id.* ¶ 187.) Plaintiffs assert that Serge offered Lee and Rehmat secret ownership in CL and thus CLG, which made it possible to perpetrate and conceal the fraud. (*Id.* ¶ 188-189.) In other words, Serge actively hid from Plaintiffs facts that might have uncovered the fraud. (*See id.* ¶¶ 190-91.) After the fraud was uncovered in 2002, Plaintiffs assert that Serge knowingly helped Rehmat promote the Cement-Lock Technology for Unitel. (*Id.* ¶ 193-94.)

Plaintiffs have also alleged Kao's role in the Cement-Lock fraud. In particular, Plaintiffs have asserted that Kao prepared phony technical reports in late 2002, intended to paper GTI's files with a supply of technical reports. (Verified Am. Compl. ¶ 195.) This allegation is sufficient to survive a motion to dismiss.[4]

Plaintiffs are directed to amend Counts II and VI within seven days.

## B.    Unitel Defendants' Knowledge

In addition to their argument concerning the sufficiency of the pleading, the Unitel Defendants have challenged the sufficiency of Plaintiff's evidence in support of the Cement-Lock fraud claims. They contend, specifically, that there is no evidence to support an inference that they were aware of the fraud being perpetrated. (Defs.' Mem. 20.) Barone and Lee have denied any knowledge that Serge, Kao, or Unitel was aware of the Cement-Lock Fraud. (Barone Dep. 244-45 (Barone was not aware of whether Serge knew of the kickback scheme or division of the kickbacks, but Serge did know the money was being sent to Singh), Defs.' Ex. J; Lee Dep. 252-65, 358-65 (Lee never informed Serge or anyone at Unitel of the division of kickbacks among Barone, Lee, and Singh; Lee never informed Serge or anyone at Unitel that Lee was receiving a portion of the money paid to Wayne and Associates; Lee never informed Serge or anyone at Unitel that he controlled

---

[4]    Kao does not appear to have moved for summary judgment based on the sufficiency of the evidence relating to this claim to make him a part of the conspiracy.

Wayne and Associates; Lee was not aware that he or any of his family members made payments to Serge, Kao, or anyone at Unitel; Lee never told Serge, Kao, or anyone at Unitel about the kickback scheme, nor was he aware that anyone else told them about the scheme), Defs.' Ex. I.) In addition, it is clear from Barone's and Lee's testimony that the kickbacks were not shared with any of the Unitel Defendants. (Berone Dep. 244-45, Defs.' Ex. J; Lee Dep. 252-65, 358-65 Defs.' Ex. I.)

Serge and Kao themselves have sworn that they lacked knowledge of the fraud perpetrated by the Core Group. Serge has affirmatively attested that "[b]efore mid-2003, I did not know of the kickback arrangements existing between Mr. Barone, Mr. Lee, and Dr. Amir Rehmat, and I did not know anyone affiliated with UT/GT or Unitel . . . that knew of these kickback arrangements." (Serge Aff. ¶ 4, Defs.' Ex. K.) Similarly, Kao has affirmatively attested that "[b]efore mid-2003, I did not know that the entities affiliated with Peter Barone, Anthony Lee, or Amir Rehmat were receiving funds for supposed work relating to the Cement Lock Project." (Kao Aff. ¶ 2, Defs.' Ex. Q.)

Plaintiffs emphasize, however, that the Unitel Defendant did have knowledge of the secret interests Rehmat and Lee had in CL. Serge himself admits that he was involved in setting up CL, a limited liability company whose members include Serge, Kao, Wayne and Associates, and Hemani. (Pls.' Resp. to Defs.' 56.1 ¶ 8; Serge Dep. 15-16, Defs.' Resp. Ex. 1.) Serge also admits that Hemani was made a 10% owner at Rehmat's suggestion, and Wayne and Associates was made a 10% owner at Lee's suggestion. (Serge Dep. 15-16, Defs.' Resp. Ex. 1.) In Plaintiffs' view, these secret ownership interests enabled the Core Group to conceal or perpetrate their fraud.

To prove the Unitel Defendants' knowledge, Plaintiffs rely heavily on documents allegedly seized from Core Group member Rehmat's home. Defendants have challenged the admissibility of these documents in a Motion to Strike [Docket Entry No. 226], arguing that the documents bearing the Bates-prefix "SEARCH" have not been authenticated and thus are inadmissible. (Mot.

to Strike 7.)  There appears to be no dispute that the documents were obtained in an FBI search. Plaintiffs believe these documents demonstrate that Serge and Kao had control over the ownership of CL.  (*See* Letter from Clark to Kao of 3/19/98 ("you no longer need my services to transfer the membership interest in Cement-Lock, LLC"), Pls.' Ex. 35 ; Handwritten Notes, undated ("CONTACT TONY RE TRANSFER TO RICHARD KAO"), Pls.' Ex. 34; Letter from Rehmat to Serge, undated, Pls.' Ex. 25.)  If they are admissible, Plaintiffs will use this evidence to show that the Unitel Defendants acted to conceal the true ownership of CL, thereby showing their knowledge of wrongdoing and complicity in it.  (Pls.' Mem. 15.)

Defendants challenge the authenticity of these documents, however, and the fact that the FBI found them at Rehmat's house does not, by itself, satisfy the court of their authenticity.  The requirement of authentication can be "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  FED. R. EVID. 901(a).  Plaintiffs note that they need "only make a prima facie showing that the exhibit is what the proponent claims it is." *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 476 F. Supp.2d 913, 921 (N.D. Ill. 2007) (emphasis omitted) (citing *United States v. Kelly*, 14 F.3d 1169, 1175 (7th Cir.1994)).  It is undisputed that the documents were gathered from Rehmat's home.  Beyond that, however, there is no indication that they are what they purport to be–not even so much as handwriting identification.  There is, as just one example, a dispute as to whether Serge actually received Plaintiff's Exhibit 25, an unsigned and undated letter to him, signed "Amir."  (Defs.' Resp. to Pls.' 56.1 ¶ 12.)

The documents might be admissible as against Rehmat himself, who asserted his Fifth Amendment right against self-incrimination when deposed regarding the documents.  (Resp. to Mot. to Strike 14.)  Plaintiffs correctly observe that a party cannot avoid authenticating documents through silence; but Rehmat's silence is not binding on the Unitel Defendants.  *See Mayer v. Angelica*, 790 F.2d 1315, 1340 (7th Cir. 1986) (*"*Because [a third party]'s silence (*not* [*defendant*]'s

silence) is sought to be used against [defendant], and because a foundation for the letters cannot 'properly rest on the silence, without other evidence' of authenticity, we believe that" letters were inadmissible.).  Nor can the fact that the documents were produced in this litigation, without more, authenticate documents first obtained by the FBI.  In *Judson*, cited by Plaintiffs, the fact that a party produced documents constituted a *prima facie* showing of authenticity, 476 F. Supp. 2d. at 921, but those were produced by the defendant itself, using the defendant's Bates label, and thus admissible against that defendant.  *Id.* at 921-22.  Here, by contrast, the documents were either produced by a different defendant or by a third party (the FBI), and the Unitel Defendant's Bates label was not used to mark them.

Plaintiffs may have other means of authenticating some or all of the documents individually. The court expects to address the issue outside the presence of the jury, most likely at the parties' scheduled Final Pretrial Conference.

In any case, as explained in Section III.D.2., there is ample evidence that Serge committed fraud in connection with the GasTech fraud.  Accordingly, absent a showing that the Cement-Lock Fraud and GasTech Fraud are not part of the same conspiracy, Serge remains liable for the entire Core Group conspiracy.  To the extent Plaintiffs establish that Unitel and UT/GT have vicarious liability for his actions, they too are liable.  *Shapo v. O'Shaughnessy*, 246 F. Supp. 2d 935, 969 (N.D. Ill. 2002) (a corporation acts through its agents, directors, and officers and thus is liable for their intentional torts committed withing the scope of their agency); RESTATEMENT (THIRD) OF AGENCY § 7.07 ("An employer is subject to vicarious liability for a tort committed by its employee acting within the scope of employment.").

## CONCLUSION

For the reasons explained above, the motion to dismiss or for summary judgment [195] is denied as to Plaintiffs' Count II (racketeering conspiracy under 18 U.S.C. §§ 1962(d) and 1964

against all Defendants); granted as to Count III (breach of fiduciary duties and the duty of loyalty against Defendant Serge); granted as to Count V (common law fraud) against Kao but denied as to Count V (common law fraud) against Serge); denied as to Count VI (civil conspiracy to commit fraud against all Defendants) and granted as to Count VII (equitable accounting against Serge and UT/GT). Defendants' motions to strike (200, 206) are granted with respect to the Rehmat documents and otherwise stricken as moot.

ENTER:

Dated: November 9, 2007

_____
REBECCA R. PALLMEYER
United States District Judge